# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| BRIAN WATSON, DANIEL SAMARGHITAN, ANNEMARIE GREENE f/k/a ANNMARIE MOHAMMED, JOSE ESPINAL, Individually, and on Behalf of all others similarly situated, | : : : : | |
| | : | Case Nos.: 20-cv-04572 (LGS)(SLC) |
| Plaintiffs, | : : | 21-cv-01588 (LGS) |
| | : | |
| vs. | : : | |
| MANHATTAN LUXURY AUTOMOBILES, INC. d/b/a LEXUS OF MANHATTAN | : : : | |
| | : | |
| Defendant | : | |
| _____ | x | |

---

## DEFENDANT'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO EXCLUDE RANDALL A. SNYDER AND ANYA VERKHOVSKAYA

---

**LONDON FISCHER LLP**
Jason M. Myers, Esq.
59 Maiden Lane
New York, New York 10038
(212) 972-1000
jmyers@londonfischer.com

**STEVENS & LEE, P.C.**
Stephanie Lopez
669 River Drive, Suite 201
Elmwood Park, New Jersey 07407
(201) 857-6768
stephanie.lopez@stevenslee.com

*Counsel for Manhattan Luxury Automobiles Inc. d/b/a Lexus of Manhattan*

{N2084346.1 }

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................................ 1

Zipwhip's Text Messaging Platform and Software ........................................................... 3

ARGUMENT ..................................................................................................................... 4

I.   Legal Standard ....................................................................................................... 4

II.   Snyder's Testimony and Expert Reports Should Be Excluded ............................ 7

A. Snyder's First Report Constitutes An Improper (and Misstated) Legal Conclusion .......... 7

B. Snyder's Reports Are Based Upon Unreliable and Untested Data .................................... 7

C. Snyder's Opinions Will Confuse And Mislead the Jury into Making Erroneous Conclusions ................................................................................................................. 10

D.   Snyder Has Performed No Expert Analysis And Provides Lay Opinions .................... 11

E.   Snyder's Opinions Have Been Previously Excluded And Disregarded By Various Courts For Similar Grounds As Set Forth By Lexus ........................................................... 12

III.   Verkhovskaya's Testimony and Expert Reports Should Be Excluded ........................ 13

A.   Verkhovskaya's Opinions Relating To The Internal Do Not Call List Must Be Excluded As They Are Not Grounded On Any Relevant Facts, Analysis, or Applicable Standards Of Law ............................................................................................. 15

B.   Verkhovskaya's Ever-Changing Methodology Is Inconsistent, Unreliable, And Will Only Confuse The Trier Of Fact .............................................................................. 17

C.   LexisNexis Cannot Reliably Determine That A Telephone Number Is Residential Or Non-Residential ............................................................................................. 22

D.   Neither LexisNexis Nor Any Third Party Database Can Reliably Determine The User Or Subscriber Assigned To A Telephone Number At A Specific Time ............................ 24

CONCLUSION ................................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                          **Page(s)**

*Amorgianos v. Nat'l R.R. Passenger Corp.*,
  303 F.3d 256 (2d Cir. 2002) ............................................................ 9

*Balshmiter v. T.D. Auto Fin. LLC*,
  303 F.R.D. 508 (E.D. Wis. 2014) ...................................................... 25

*Boucher v. U.S. Suzuki Motor Corp.*,
  73 F.3d 18 (2d Cir. 1996) ................................................................ 6

*Carrol v. SGC Automotive Services, Inc.*,
  2020 WL 7024477 (M.D. La. Nov. 30, 2020) ...................................... 24

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) .................................................................... 4, 5

*Dominguez v. Yahoo!, Inc.*,
  2017 WL 390267 at *20 (E.D. Pa. Jan. 27, 2017) ............................... 13

*Facebook, Inc. v. Duguid*,
  141 S.Ct. 1163 (2021).............................................................. 10, 12

*Gen. Elec. Co. v. Joiner*,
  522 U.S. 136 (1997) ....................................................................... 6

*Glasser v. Hilton Grand Vacations Co.*,
  2018 WL 4565751 at *7 (M.D. Fla. Sept. 24, 2018) ....................... 12-13

*Hagood v. Portfolio Recovery Assocs., LLC*,
  2020 WL 1308388 at *11 (S.D. Ill. Mar. 19, 2020) ............................ 12

*Hunter v. Time Warner Cable, Inc.*,
  2019 WL 3812063 (S.D.N.Y. Aug. 14, 2019) ............................... 24, 25

*Jacobs v. Quicken Loans, Inc.*,
  2017 WL 4838571 (S.D. Fla. Oct. 19, 2017) ...................................... 25

*Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*,
  103 F. Supp. 2d 268 (S.D.N.Y. 2000) .............................................. 10

*Kumho Tire Co. v. Carmichael*,
  526 U.S. 137 (1999) .................................................................... 4, 5

*Legg v. Voice Media Grp., Inc.*,
  2014 WL 1767097 at *3-4 (S.D. Fla. May 2, 2014) ............................ 13

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
   299 F. Supp. 3d 430 (S.D.N.Y. 2018) ................................................................. 5, 9

*Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*,
   387 F. Supp. 2d 794 (N.D. Ill. July 22, 2005) ...................................................... 10

*Major League Baseball Prop., Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ................................................................................. 6

*Marshall v. CBE Grp., Inc.*,
   2018 WL 1567852 at *8 (D. Nev. Mar. 30, 2018) ................................................ 12

*Mejia v. Time Warner Cable, Inc.*,
   2017 WL 3278926 at *30 (S.D.N.Y. Aug. 1, 2017) ......................................... 15, 16

*Nimely v. City of New York*,
   414 F.3d 381 (2d Cir. 2005) ............................................................................. 5, 6

*Panzarella v. Navient Sols., LLC*,
   2020 WL 3250508 at *3-5 (E.D. Pa. June 16, 2020) ........................................... 13

*In re Paoli R.R. yard PCB Litig.*,
   35 F.3d 717 (3d Cir. 1994) ................................................................................. 25

*Ramos v. Hopele of Fort Lauderdale, LLC*,
   334 F. Supp. 3d. 1262 (S.D. Fla. 2018) .............................................................. 12

*Ruggiero v. Warner-Lambert Co.*,
   424 F.3d 249 (2d Cir. 2005) ........................................................................ 6, 7, 16

*SEC v. Tourre*,
   950 F. Supp. 2d 666 (S.D.N.Y. 2013) ................................................................ 11

*Sherman v. Yahoo! Inc., No.*
   2014 WL 5604400 at *6 (S.D. Cal. Sept. 23, 2015) ............................................. 25

*In re TMI Litig.*,
   193 F.3d 613 (3d Cir. 1999) ............................................................................... 10

*United States v. Jiau*,
   734 F.3d 147 (2d Cir. 2013) ............................................................................... 11

*United States v. Williams*,
   506 F.3d 151 (2d Cir. 2007) ................................................................................. 5

*Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*,
   571 F.3d 206 (2d Cir 2009) ........................................................................... 6, 10

## **Statutes**

47 U.S.C. § 227 .................................................................................................. 1

## **Rules**

Federal Rule 702 ............................................................................................................. *passim*

Rule 702 ................................................................................................................... 5, 17

Rule 702(a) .................................................................................................................. 11

## TABLE OF EXHIBITS[1]

| Exhibit | Title |
|---|---|
| A | Expert Rebuttal Report of Randall Snyder, dated January 12, 2021 |
| B | Expert Report of Randall Snyder, dated June 3, 2021 |
| C | Excerpts from Deposition Transcript of Randall Snyder, taken on July 16, 2021, in the instant matter |
| D | Expert Report of Anya Verkhovskaya, dated October 20, 2020 |
| E | Supplemental Expert Report of Anya Verkhovskaya, dated January 12, 2020 |
| F | Supplemental Expert Report of Anya Verkhovskaya, dated January 12, 2020 (served January 15, 2020) |
| G | June 2021 Supplemental Expert Report of Anya Verkhovskaya |
| H | Supplemental and Rebuttal Expert Report of Anya Verkhovskaya, dated September 2, 2021 |
| I | Excerpts from Deposition Transcript of Anya Verkhovskaya, taken on July 22, 2021, in the instant matter |
| J | Excerpts from Deposition Transcript of Anya Verkhovskaya, taken on November 12, 2021, in the instant matter |
| K | Expert Report of Ken Sponsler, dated December 17, 2020 |
| L | Expert Report of Ken Sponsler, dated August 11, 2021 |
| M | Excerpts from Deposition Transcript of James Lapic in *Schleifer v. Lexus of Manhattan, et al.*, Civil Action No. 17-cv-08789 (AJN) |
| N | Excerpts from Deposition Transcript of Salvatore Iacono in *Schleifer v. Lexus of Manhattan, et al.*, Civil Action No. 17-cv-08789 (AJN) |
| O | Supplemental and Rebuttal Expert Report of Ken Sponsler, dated December 7, 2021 |

---

[1] All exhibits are to the Declaration of Jason Myers ("Myers Decl."), dated February 16, 2022, unless otherwise indicated.

| P | Expert Report of Jennifer Smith, dated December 12, 2020 |
|---|---|
| Q | Expert Rebuttal Report of Jennifer Smith, dated August 11, 2021 |
| R | Supplemental and Rebuttal Expert Report of Jennifer Smith, dated December 10, 2021 |
| S | Declaration of James Lapic, dated September 15, 2020, in response to Plaintiffs' Third Party Subpoena |
| T | Declaration of Craig L. Davis Regarding Documents and Information Produced by LexisNexis in Response to Subpoenas in *Chinitz v. Intero Real Estate Services*, Civil Action No. 18-cv-05623-BLF, filed in the United States District Court for the Northern District of California, dated April 17, 2020 |
| U | LexisNexis Batch Design and Transfer Document filed as Exhibit E to the January 12, 2020 Supplemental Expert Report of Anya Verkhovskaya |
| V | Honda of Manhattan's Closing Email to Customers (LOM000070-LOM000071) |

## INTRODUCTION

The crux of this litigation focuses on Plaintiffs' claim that Lexus violated the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et. seq.* ("TCPA") when the dealership offered, via text message, Honda of Manhattan ("Honda") customers service and/or maintenance to their Honda vehicles following the closure of Honda's dealership and Honda's notices of same. Plaintiffs rely upon the expert reports and opinions of Randall A. Snyder ("Snyder") and Anya Verkhovskaya ("Verkhovskaya") in an attempt to establish: (1) that the text messaging platform and software owned and developed by Zipwhip, Inc. ("Zipwhip") and used by Lexus is an automatic telephone dialing system ("ATDS"); (2) Lexus failed to maintain internal do not call procedures; and (3) the ascertainability of the putative class members. Neither the reports nor testimonies of Snyder and Verkhovskaya meet the criteria required by Federal Rule 702, requiring exclusion of the expert reports in their entirety.

Snyder's reports should be excluded because they improperly provide (inaccurate) legal conclusions, they are unreliable, and do not "fit" the facts of the case. Indeed, Snyder never personally tested the applicable system platform, and his opinions are grounded on system manuals to a platform Lexus never used. To that end, Snyder's reports will mislead the jury to make erroneous conclusion rather than provide any assistance as he fails to recognize and acknowledge that Lexus only used Zipwhip's Version 1.0 Economy Package, and opines and testifies about Version 2.0 that did not even exist during the operative time period.

Verkhovskaya should be excluded because her five reports contain unreliable methodologies based upon unsupported and insufficient data received from third-parties. Verkhovskaya's methodologies, as addressed in great detail by Lexus's experts, Jennifer Smith ("Smith") and Kenneth Sponsler ("Sponsler"), are riddled with flaws and inconsistencies.

Additionally, Verkhovskaya's testimony and reports contradict her actual work product that purportedly demonstrates how she implemented her methodology into code. In short, Verkhovskaya's expert opinions and testimony provide no value here.

Excluding, both Snyder and Verkhovskaya is consistent with recent federal decisions finding their opinions and reports, based upon similar methodologies, or lack thereof, and relying upon the same insufficient data, wholly unreliable and irrelevant. For the reasons set forth herein, and those stated in Smith and Sponsler's reports, Lexus respectfully requests that this Court exclude Snyder and Verkhovskaya's expert reports and opinions in their entirety.

## **RELEVANT BACKGROUND**

Plaintiffs allege that Lexus violated the TCPA, and certain FCC regulations promulgated thereunder, by: (1) sending a purported unsolicited text message from an ATDS, (2) failing to adhere to the National Do-Not-Call Registry, and; (3) failing to institute procedures for maintaining an internal Do-Not-Call list. [ECF No. 104]. Lexus has denied Plaintiffs' allegations. [ECF No. 109].

The subject texts were born in response to Honda's closure. (Ex. N at 67:10-12). Honda, in an effort to fulfill its obligations to their customers, entered into a verbal joint marketing agreement with Lexus to service its Honda customers. (*Id.* at 64-70, 74-75, 88-89). On January 31, 2017, Honda notified its established customer base by email and text message that the dealership was closing and that Honda's "sister dealership Lexus of Manhattan is still capable of servicing your Honda." (Ex. V). Those emails and text messages contained opt-out language for customers to elect to no longer receive future communications. (Ex. V). In furtherance of the aforesaid, Lexus, through Zipwhip's proprietary online platform, sent a follow-up text message on February 7, 2017, to those Honda customers who had not opted-out of future communications. [Ex. N, at pp. 51-52].

The follow-up text message offered Honda customers either maintenance, service, and/or New York State inspections to their Honda vehicles. (*Id.*) Lexus completed its follow-up texting to Honda customers on November 11, 2017. (*Id.*).

**Zipwhip's Text Messaging Platform and Software**

During the relevant time period, Lexus purchased Zipwhip Version 1.0 from Zipwhip, a texting platform, to send the subject text messages. (Ex. M at pp. 35, 164). While Zipwhip currently offers a variety of SMS platform packages, including Economy, Business, and Enterprise, Zipwhip Version 1.0 is the only version and system Lexus ever used to text Honda customers. (*Id.* at pp. 25, 164; Ex. L, ¶ 30). In fact, James Lapic, Zipwhip Co-Founder and Chief Technology Officer, testified that only Zipwhip Version 1.0 existed in 2017, and that Version 2.0 was not launched until 2018. (Ex. M at 25:9-21). To that end, Lexus terminated its contract and use of Zipwhip's platform prior to the existence of Version 2.0. [*Id.* at p. 25; Ex. N at p. 95].

Zipwhip offered Version 1.0 software in two primary product packages – Economy and Business. ( Ex. M at 35). It is undisputed that, at all relevant times hereto, Lexus had licensed and used Zipwhip's **Economy Package Version 1.0**. (*Id.* at p. 164; Ex. L, ¶ 30). Zipwhip's Economy Package Version 1.0 (the "Economy Package V1.0"), as Lapic testified, had the capability of one-to-one conversational texting and of sending up to 50 outbound messages to individuals. [Ex. M at 38:4-12]. If there was a reply by a recipient, then it was a one-to-one reply to Lexus. [*Id.* at 37-38; Ex. L; Sponsler Report, K ¶¶ 89, 93]. Moreover, unlike the Business Package, Economy Package V1.0 was "not able to save" multi-recipient individual messages for later communication. [Ex. M at 38:19:25].

Critically, Economy Package V1.0 required human/user intervention at every step of the process to send a text message. [Ex. K, ¶ 93]. To send a text using Economy Package V1.0, a user

had to either manually type in the recipient telephone numbers or copy and paste the telephone numbers (up to 50) from a preexisting contact list or an Excel spreadsheet. [*Id.*, ¶ 93; Ex. M. at pp. 38-39]. Next, the user would have to manually copy the content of the text by typing the message, then the user would have to manually click "preview" or "send" on Zipwhip's web-based platform to transmit the text message. [Id.]. In this instance, Lexus, relying upon a preexisting Honda customer contact list, manually typed each telephone number and each message (for up to 50 customers), before clicking the send button. [Ex. N, p. 201].

Moreover, the Zipwhip texting platform and software, as Lapic affirmatively testified and as confirmed through Sponsler's own testing, was not capable of generating ten-digit telephone numbers on its own, and the system did not have the capacity to generate random or sequential telephone numbers. [Ex. M, p. 164; Ex. K, ¶¶ 91, 98-99]. In fact, Snyder conceded, "the platform isn't a sequential number generator." [Ex. C at 67].

## ARGUMENT

### I.   Legal Standard

Federal Rule of Evidence 702 requires district courts to ensure all expert testimony is "not only relevant, but reliable." *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993) ("*Daubert*"); *see also Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). Accordingly, a district court may admit expert testimony only if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. "[I]t is critical that an expert's analysis be reliable at every step," because the entire testimony is inadmissible if "*any* step []

renders the analysis unreliable under the *Daubert* factors." *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002).

The proponent of expert testimony bears the burden of "establishing by a preponderance of the evidence that the admissibility requirements of Rule 702 are satisfied." *United States v. Williams*, 506 F.3d 151, 160 (2d Cir. 2007). Expert testimony at the class certification stage is subject to the *Daubert* standard. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 470 (S.D.N.Y. 2018). However, "the district court is the ultimate 'gatekeeper,'" *Id.*, and can exercise discretion when applying the *Daubert* principles to each particular case, *Kumho Tire*, 526 U.S. at 150; *In re LIBOR*, 299 F. Supp. 3d at 469.

Before permitting a person to testify as an expert under Rule 702, the court must find that: (1) the witness is qualified to be an expert; (2) the opinion is based upon reliable data and methodology; and (3) the expert's testimony on a particular issue will "assist the trier of fact." *Nimely v. City of New York*, 414 F.3d 381, 396-97 (2d Cir. 2005). To be relevant, expert testimony must "assist the trier of fact to understand the evidence to determine a fact in issue." *Id.*; *see also In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 469 (S.D.N.Y 2018).To be reliable, an expert's testimony must be grounded in reasoning or methodology that is scientifically valid. *Daubert*, 509 U.S. at 590. Courts may also consider (1) whether the expert's method is a testable hypothesis; (2) "whether the theory or technique has been subjected to peer review and publication;" (3) the technique's "known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation;" and (4) whether a particular technique or theory has gained general acceptance in the relevant scientific community." *Williams*, 506 F.3d at 160 (quoting *Daubert*, 509 U.S. at 593-94).

Expert testimony that is inherently unreliable, speculative, or "based on assumptions that are 'so unrealistic and contradictory as to suggest bad faith' or to be in essence 'an apples and oranges comparison'" should be excluded. *Zerega Ave. Realty Corp. v. Hornbeck Offshore Transp., LLC*, 571 F.3d 206, 213-14 (2d Cir 2009) (quoting *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996)); *see also Major League Baseball Prop., Inc. v. Salvino, Inc.*, 542 F.3d 290, 311 (2d Cir. 2008) (expert testimony should be excluded if it is "speculative or conjectural"). Further, if the expert testimony is not sufficiently rooted in the facts of the case – for example, if the available data and proffered opinion are separated by an analytical chasm – the gap cannot be bridged by the expert's say-so. *Nimely*, 414 F.3d at 396 (alteration in original) ("[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." (quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997))).

Guided by those principles, the Snyder and Verkhovskaya reports and opinions warrant complete exclusion. Specifically, Snyder's report and opinion is completely unreliable and will not help the trier of fact to understand the evidence or any issue in this case as Snyder opines on the wrong version of Zipwhip's platform - a platform Lexus neither licensed nor used. Fed. R. Evid. 702; *see also Ruggiero v. Warner-Lambert Co.*, 424 F.3d 249, 253 (2d Cir. 2005); *Amorgianos*, 303 F.3d at 267. Verkhovskaya's reports warrant exclusion in their entirety as her opinions are based on incorrect and multiple methodologies that are inadequate to support the conclusions reached in each of her reports. *Ruggiero*, 424 F. 3d at 249. Additionally, Verkhovskaya relied upon data and information from LexisNexis that has been specifically rejected by federal court because

it cannot determine who in fact received a text message and whether that person registered with the National Do Not Call Registry. And, as such, her reports fail to establish ascertainability.

## II.     Snyder's Testimony and Expert Reports Should Be Excluded

### A.   Snyder's First Report Constitutes An Improper (and Misstated) Legal Conclusion

Through his January 2021 Report, Snyder seeks to offer conclusory legal opinions on the ultimate legal issue in this case; to wit, whether the Zipwhip platform Lexus used meets the statutory definition of an ATDS. Snyder's opinion, without more, tracks the ATDS statutory definition. In so doing, Snyder improperly usurps the Court's role and judgment on, and application of, the law. And, as such, should be stricken by the Court. Compounding this impropriety is Snyder's misstatement of the law. Snyder's January 2021 opinion admittedly relied upon a pre-*Facebook* definition of an automatic dialing system. [Ex. C at 29:16]. In fact, Snyder testified that "[t]he functions [he] needed to analyze" altered following the change in law. [*Id.* at 29:13-16]. Snyder also admitted that his June 2021 Report does "not as far as my particular opinions" rely on the January 12 Report and it is only the June Report he intend to offer in this matter. [*id.* at 28:20-21, 29:17-30:2]. In the end, Snyder's January 2021 opinions are unreliable legal opinions that will only serve to confuse, and not assist, the trier of fact on the issues in dispute.

### B.   Snyder's Reports Are Based Upon Unreliable and Untested Data

Snyder's opinions concerning the capabilities and functionality of Zipwhip's software and platform are not reliable because those opinions are not premised on actual "facts or data," are not tested, and will not "help the trier of fact to understand the evidence" or any issue in this case. Fed. R. Evid. 702; *see also Ruggiero*, 424 F.3d at 253; *Amorgianos*, 303 F.3d at 267.

Plaintiffs retained Snyder solely to evaluate whether the functionality of Zipwhip's platform and software was an ATDS under the TCPA. [Ex. C, pp. 43, 82][2]. Rather than base his opinions on the specific Zipwhip package at issue (Economy Package V1.0), Snyder engages in an unnecessary (and confusing) evaluation of a different, and incorrect, Version and package Lexus used. [Ex. C at 76]. Moreover, Snyder undisputedly *did not use or test* the software. [Ex. C., p. 55]. Snyder attempts to overcome this fact by claiming that "[d]ialing system documentation and manuals" are the "most important piece of information to understand" a system's functionality and capabilities. (Ex. B ¶ 39). Yet, Snyder conceded during his deposition that he did not know what version and package applied to the manuals he reviewed to support his opinion, (Ex. C., p 75-77), and repeatedly posited that the manuals he relied upon applied to either Version 2.0 or the Business package, (*id.* at 75-77, 99-100, 190, 111-113, 122, 158, and 183). To that end, Snyder testified that he did not know what version and package Lexus used, (*Id.* at 76), how Lexus actually used the platform, (*Id.* at 60:3-7), and if there was a difference between the Economy and Business package version 1.0 (*id.* p. 124). Snyder's failure to have the basic understanding of which version and package Lexus used, let alone, the fact he reviewed manuals without knowing which version the manual referred to, is fatal to Snyder's testimony and opinions. What is more, Snyder's failure to test the system, and his theory, renders his reports unsupported speculation and a mere guess regarding how Lexus used the Economy Package V1.0.

Additionally, Snyder's failure to consider key evidence concerning Zipwhip's functionality provided directly by Zipwhip's CTO and Co-Founder Lapic's testimony compounds the unreliable nature of his opinions. For instance, Snyder's testimony wholly ignores Lapic's testimony

---

[2] Snyder was not retained to opine as to the ascertainability of any particular class in this action. (Ex. C., p. 82 ("I was not asked to opine on any particular class. I was simply asked to opine on the capabilities on functions of the Zipwhip system independent of these [class] definitions.")).

distinguishing the 2017 Economy Package V1.0 as having a much more simplistic functionality than the subsequently launched Version 2.0. Lapic's testimony detailed the limited software capabilities of the applicable version and package, and also directly refutes many of Snyder's opinions, testimony, and description of the platform's functionality. For example, Snyder testified that V.10 had the capability of storing group text messages [Ex. C, at pp. 107-110]. However, Lapic's testimony summarized, and Sponsler confirmed, Zipwhip's Economy Package V1.0 limited functionality as follows:

- No capacity to produce telephone numbers. (Ex. M, p. 164).
- No capacity to randomly or sequentially produce numbers. (Ex. M, p. 164).
- No capacity to dial numbers that were randomly or sequentially (Ex. M, p. 68).
- produced. (Ex. M, p. 164).
- No ability to "schedule" text message delivery for a date/time in the
- future. (Ex. M, p. 164).
- No ability to "upload" a list of telephone numbers.
- No ability to "save" or "store" groups from text campaigns for use at
- any future time. (Ex. M, p. 39).
- Limited ability to send text messages, no more than 50 text messages that had to be copied and pasted or manually typed into the Blind Carbon Copy ("BCC") field so as to preclude revealing recipient information to others. (Ex. M, pp. 38-39).
- No ability for users of the platform, such as Lexus, to access the
- software code to make any changes. (Ex. M, p. 164).
- No access to Zipwhip servers or hardware. (Ex. M, p. 164).
- Lexus had no access to the Application Programming Interface ("API"). (Ex. M, p. 155).

[*See also*, Ex. K, ¶ 89; Ex. L, ¶¶ 47, 51-53, 60, 64-65]. Snyder's reliance on a different version and package creates an analytical gap between the value of his conclusions and the source of data he relies upon, thereby making his opinion unreliable, irrelevant, and of no value or assistance to the trier of fact. *See In re LIBOR*, 299 F. Supp. 3d at 469 ("[e]xpert testimony which does not relate to any issue in the case is not relevant and, ergo, non-helpful.").

As addressed in *Zerega*, expert opinions are regularly excluded where they are irrelevant and provide an "apples and oranges" comparison rather than an "apples and apples" comparison.

*Zerega*, 571 F.3d at 213-14. Here, no comparison can be drawn between the functionality and capabilities of Version 1.0 and 2.0, and the Economy and Business packages. This is the quintessential "apples and oranges" analysis that  courts have prohibited and deemed inadmissible. *E.g., Zerega*, 571 F.3d at 213-14; *Loeffel Steel Prods., Inc. v. Delta Brands, Inc.*, 387 F. Supp. 2d 794, 812 (N.D. Ill. July 22, 2005). Additionally, the convoluted data and sources Snyder relied upon in his reports are so unreliable that no reasonable expert in this field could base an opinion on Version 1.0 of the Economy Package. *Johnson Elec. N. Am. Inc. v. Mabuchi Motor Am. Corp.*, 103 F. Supp. 2d 268, 283 (S.D.N.Y. 2000); *In re TMI Litig.*, 193 F.3d 613, 697 (3d Cir. 1999) ("[I]f the data underlying the expert's opinion is so unreliable that no reasonable expert could base an opinion on them, the opinion resting on that data must be excluded."). For these reasons, Snyder's reports and opinions should be excluded.

C. <u>Snyder's Opinions Will Confuse And Mislead the Jury into Making Erroneous Conclusions</u>

The Supreme Court has defined an ATDS as a system that must have "the capacity to use a random or sequential number generator to either store or produce phone numbers to be called." *See Facebook, Inc. v. Duguid*, 141 S.Ct. 1163, 1173 (2021). Based upon Snyder's conflicting reports and testimony concerning what type of system qualifies as an ATDS, in conjunction with the conflated capabilities of Zipwhip V1.0 and V2.0, the admission of his opinions will only confuse the jury as to the correct operating system's capabilities in 2017. Indeed, Snyder's testimony provides statements contradictory to his ultimate conclusion that Zipwhip V.10 is an ATDS which in actuality support that V1.0 was not an ATDS. For example, Snyder conceded "the platform isn't a sequential number generator." [Ex C., p. 67]. Snyder testified that Zipwhip's system had the capability to "store" numbers based upon an automated import function that was applicable to Version 2.0, not Version 1.0. [Ex. C, p. 103]. To the contrary, Lapic testified that Version 1.0 did

not have the ability to save or store groups of telephone numbers. [Ex. M, p. 39]. Snyder also testified that Zipwhip's platform could not produce telephone numbers as it required the Lexus employee to copy and paste the telephone numbers into the system from a preexisting list of customers. [Ex. C., pp. 95, 105-106, 117].

These examples of statements by Snyder support the fact that Zipwhip V1.0 was **not** an ATDS under the Supreme Court's decision in *Facebook*. Permitting the submission of Snyder's contradictory and confusing testimony and reports will only mislead the jury and provide no assistance as to whether Zipwhip V.10 qualifies as an ATDS.

D.  Snyder Has Performed No Expert Analysis And Provides Lay Opinions

An expert must do more than simply demonstrate a general knowledge in a particular field to be permitted to testify. Courts have determined that expert testimony that seeks to address "lay matters which [the trier of fact] is capable of understanding and deciding without the expert's help" is not relevant and is therefore inadmissible. *United States v. Jiau*, 734 F.3d 147, 154 (2d Cir. 2013). That is, testimony addressing lay matters is not based on an "expert's scientific, technical, or other specialized knowledge," and therefore fails to satisfy the first part of Rule 702(a). Accordingly, it is "inappropriate for experts to become a vehicle for factual narrative." *SEC v. Tourre*, 950 F. Supp. 2d 666, 675 (S.D.N.Y. 2013).

Although Snyder was retained as an expert and his *curriculum vitae* set forth experience in the field of the TCPA, he testified on several occasions that his understanding of how a system would constitute an ATDS under the TCPA is only a "lay interpretation." (Ex. C, pp. 84, 88, 95 ("My interpretation is a lay interpretation unless I get direction from an attorney"); ("My understanding is the random number generator or sequential number generator algorithms have a certain application to the characteristics of an ATDS, so if no number generator algorithm is used

at all . . . my lay understanding is that that's not considered an ATDS at this point."); ("[M]y current lay understanding, is that the system needs to create numbers out of whole cloth and them dial them" to produce numbers as an ATDS). It stands to reason that Snyder qualifies his opinions as "lay interpretations" to avoid the deficiencies and exclusions found by prior courts.

For a system to qualify as an ATDS, the Supreme Court has determined that the device must have "the capacity to use a random or sequential number generator to either store or produce phone numbers to be called." *See Facebook*, 141 S.Ct. at 1173. The fact that Snyder can only provide his "lay opinion" as to what type of system qualified as an ATDS within the Supreme Court's definition rather than expert opinion as to whether Zipwhip's platform and software had the capabilities defined by the Supreme Court warrants exclusion of his testimony and opinion in its entirety.

### E. Snyder's Opinions Have Been Previously Excluded And Disregarded By Various Courts For Similar Grounds As Set Forth By Lexus

This is not the first time Snyder is being criticized for his baseless opinions. As a high-volume, serial TCPA plaintiffs' expert, Snyder has a long history of offering untested opinions unsupported by relevant facts or data, or a reliable methodology. And, has an equally long history of exclusion and/or criticism for failing to employ a reliable methodology or perform the analysis necessary to support his opinions: *Hagood v. Portfolio Recovery Assocs., LLC*, 2020 WL 1308388 at *11 (S.D. Ill. Mar. 19, 2020) (excluding Snyder's testimony regarding whether a contact dialer could store or produce telephone numbers because it was "not based on sufficient facts or data."); *Marshall v. CBE Grp., Inc.*, 2018 WL 1567852 at *8 (D. Nev. Mar. 30, 2018) (refusing plaintiff's reliance on Snyder's opinions regarding dialing system's ATDS/"autodialer" status, as he had "never reviewed the LiveVox system used in this case" and "did not know what dialing system LiveVox uses"); *Ramos v. Hopele of Fort Lauderdale, LLC*, 334 F. Supp. 3d. 1262, 1265 (S.D. Fla. 2018) (rejecting Snyder's opinion regarding how a computer function could be used because

he "did not test out this function"); *Glasser v. Hilton Grand Vacations Co.*, , 2018 WL 4565751 at *7 (M.D. Fla. Sept. 24, 2018) (criticizing Snyder for opining on the effect of human intervention in the dialing process while "profess[ing] not to know what constitutes human intervention"); *Legg v. Voice Media Grp., Inc.*, 2014 WL 1767097 at *3-4 (S.D. Fla. May 2, 2014) (excluding Snyder's testimony as "misleading and speculative," "lacking an adequate foundation," and grounded in "insufficient" facts; *Dominguez v. Yahoo!, Inc.*, 2017 WL 390267 at *20 (E.D. Pa. Jan. 27, 2017), *aff'd*, 894 F.3d 116 (3d Cir. 2018) (excluding Snyder's opinions because his "methodologies [were] not testable and not falsifiable" and "not reliable"); *see also Panzarella v. Navient Sols., LLC*, 2020 WL 3250508 at *3-5 (E.D. Pa. June 16, 2020) (rejecting Snyder's opinion that the defendant's dialing system was an ATDS).

Applying the reasons set forth in the aforementioned Court decisions to the reports and opinions here, Lexus respectfully requests that this Court exclude Snyder's reports and opinions in their entirety.

## III.    Verkhovskaya's Testimony and Expert Reports Should Be Excluded

Plaintiffs retained Verkhovskaya to opine on the identification and ascertainability of potential putative class members within the ATDS Class, the internal do-not-call ("IDNC") list Class, and the NDNCR Class. [Ex. I at 193-194; Ex. J at 46-48]. As addressed herein, and in greater detail within Smith and Sponsler reports,[3] Verkhovskaya's methodology and data is unreliable, extremely flawed, and should be deemed inadmissible by this Court.

Throughout the course of this action, Verkhovskaya has exchanged <u>five</u> expert reports (one without permission of the Court[4]) that contained different methodologies and variations in her

---

[3] As per the Court's Order dated January 5, 2022 (Doc. No. 133) the parties are limited to a total of twenty-five pages.
[4] *See* the Court's Order dated October 19, 2021 (Doc. No. 126).

results in an attempt to correct glaring errors explicitly raised in the rebuttal reports issued by Smith and Sponsler. Even after four attempts, Verkhovskaya's fifth and final report contains errors in the methodology and demonstrates clear cherry-picking of data to manipulate favorable  results to support Plaintiffs' baseless claims as to the ATDS Class and NDNCR Class. Smith's rebuttal reports detail the evolution of Verkhovskaya's methodology and demonstrate that the code, reports, and opinions are completely unreliable. Additionally, Verkhovskaya provides conclusions based upon unreliable data from third-parties that have been found to be insufficient sources of information for the purposes of class ascertainability under the TCPA. As such, Verkhovskaya's opinions and testimony concerning the ATDS and NDNCR Class should be excluded.

Moreover, Verkhovskaya's conclusions relating to the IDNC Class are without any merit as her own testimony contradicts her reports, methodology and conclusions. Specifically, Verkhovskaya testified that **<u>not a single Honda customer</u>** received a text message after typing "stop" even though Verkhovskaya concludes that more than 40 individuals can be identified for the putative IDNC Class. The testimony and irrefutable data evidence that Zipwhip's platform had the capability and functionality to prohibit future text messages following a "stop" message. Verkovksaya's opinion and methodology as to the IDNC Class provides the trier of fact no assistance or help as it is grounded in falsities, conjecture, and unreliable data. And, as such, will confuse and mislead the jury into rendering erroneous conclusions.

For the reasons set forth herein, and in the reports of Smith and Sponsler, all five of her reports and opinions (Exs. D-H)[5], as well as her two days of testimony (Exs. I, J)[6] should be excluded and deemed inadmissible.

A. Verkhovskaya's Opinions Relating To The Internal Do Not Call List Must Be Excluded As They Are Not Grounded On Any Relevant Facts, Analysis, or Applicable Standards Of Law

Verkhovskaya's reports concerning the IDNC Class should be excluded because the evidence and testimony irrefutably and uncontrovertibly demonstrate that not a single Honda customer received a subsequent text message after typing "stop". The relevant TCPA regulation for internal do-not-call list violations provides that "no person or entity shall initiate any call for telemarketing purposes to a residential telephone subscriber unless such a person has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity." *Mejia v. Time Warner Cable, Inc.*, 2017 WL 3278926 at *30 (S.D.N.Y. Aug. 1, 2017). Zipwhip's platform had the procedures and functionality to prevent any future text messages from being sent to Honda customers.

Lapic testified as to the technical functionality of the "stop" function within Zipwhip's platform. [Ex. M, p. 85-88]. Lapic stated that "any consumer that sends the word stop and only the word stop to a user of the Zipwhip platform is unsubscribed and is opted out of text messaging. The ability for the user to communicate to the consumer is revoked, and they are no longer able to reply." [*Id.* at 86:7-13, 159:19-20]. As an example of Zipwhip's procedures for prohibiting future text messages to those who typed "stop", the Court is referred to the Declaration of James Lapic

---

[5] Expert Report of Anya Verkhovskaya dated October 20, 2020 (Ex. D); Supplemental Expert Report of Anya Verkhovskaya dated January 12, 2020 (Ex. E); Supplemental Expert Report of Anya Verkhovskaya dated January 12, 2020 (served on January 15, 2020) (Ex. F); June 2021 Supplemental Expert Report of Anya Verkhovksaya dated June 9, 2021 (Ex. G), and; (5) Supplemental and Rebuttal ("S&R") Report of Anya Verkhovksaya dated September 2, 2021 (Ex. H).
[6] Testimony of Anya Verkhovskaya dated July 22, 2021 (Ex. I) and November 12, 2021 (Ex. J).

dated September 15, 2020, produced in response to Plaintiffs' third-party subpoena. [Ex. S]. Consistent with his testimony. Ex. R. Lapic explained that named Plaintiff Samarghitan (telephone number ending in 1785) typed "STOP" on June 16, 2017, and at the time of the "stop" message, the "Zipwhip platform automatically blocked any further messages between [Lexus's] account and the telephone". [*Id*, ¶¶ 6-9]. Due to Samarghitan's opt-out, the Zipwhip platform blocked the future message attempted on November 1, 2017 and Lexus would have received a failure notification indicating that the text message was not sent. [*Id*. at ¶8]. Lapic, through extracting Zipwhip's data (which was disclosed to Plaintiffs annexed hereto as Ex. Z) demonstrated and confirmed that any potential future text message to customers who opted-out failed. [*Id*., ¶9]. Moreover, Smith confirmed through the data and source information that not a single customer who typed "stop" received a subsequent message. [Ex. Q, ¶58]. Smith also confirmed that named Plaintiff Greene is another example of Lexus's successful opt-out, "stop" functionality. [Ex. Q, ¶¶ 61-62].

Despite reporting that she identified "a substantial number (well over 40) of unique residential telephone numbers" that are within the IDNC Class, Verkhovskaya testified that she did not conduct any testing or analysis as to whether any Honda customers received a text message *after* typing "stop." [Ex. I, at 189-190]. Verkhovskaya instead "relied on counsel's representation[s]." [*Id*.]. Indeed, she testified that:

> Q: Following your review of the Smith report in this case, did you subsequently conduct any analysis to determine if any successful messages were received after stop was sent by a Honda customer?
> A: I don't think so.
> Q: Why would you not conduct any further analysis to confirm whether any Honda customers received messages after a stop was sent?
> A: I relied on counsel's representation of his knowledge of that it didn't happen.
> Q: That it didn't happen?
> A: Correct. And it was the most conservative approach.
> Q: So you're understanding, as you sit here today, none of the Honda customers received any messages after typing stop?
> A: That is my understanding.

[*Id.*]. Therefore, the IDNC portion of Verkhovskaya's reports are unreliable, present an invalid methodology, and provide no value in identifying and ascertaining the potential class members, requiring exclusion of these opinions and testimony. *Ruggiero*, 424 F.3d at 253.

B. Verkhovskaya's Ever-Changing Methodology Is Inconsistent, Unreliable, And Will Only Confuse The Trier Of Fact

Verkhovskaya's S&R Report relies upon a seven (7) step method in an effort to identify and ascertain potential putative members of the ATDS and NDNCR Classes. In order to qualify as an expert under Rule 702, Verkhovskaya is required to establish that every step of her methodology is reliable and failure to prove such reliability renders her testimony and reports inadmissible. *Amorgianos*, 303 F.3d at 266. As evidenced by the data, inconsistent results, and opinions set forth by Smith, not every step of Verkhovskaya's methodology can be considered reliable thereby resulting in inadmissibility of her entire method.

Verkhovskaya's 7 step "final" methodology is set forth in Paragraph 15 of her S&R Report and is stated as follows:

**STEP 1**: I removed from further analysis any telephone numbers that appeared in the Lexus Text Records and also appeared in the Honda Contact File as a "Business Telephone Number" (Verkhovskaya October Report 29) as well as in the Service Report - Responsive - CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER.xls file; and any and all telephone calls that had any business names associated with respective telephone numbers;

**STEP 2**: I removed from further analysis any text message record that did not include any of the texts in Table 1 of Verkhovskaya June Report (¶ 11.a.) and in Table 2 of Verkhovskaya June Report (¶ 21);

**STEP 3**: I removed from further analysis any consumer telephone numbers that had received a reply text after one delivered message, containing certain keywords indicating permission to text. Those keywords are: "yes," "Stop," "Sure," "Schedule," "Appointment," "OK," "am (without "I am")," "pm," "Mon," "Tue," "Wed," "Thur," "Fri," regardless of capitalization, or any numeric digits. (Verkhovskaya June Report ¶ 11.b.);

**STEP 4**: I removed from further analysis any remaining inbound text message records. (Verkhovskaya June Report ¶ 11.c.);

**STEP 5**: I removed from further analysis any records that had a delivery status of

"Failed" as their "Delivery Status." (Verkhovskaya June Report, ¶ 11.d.);

**STEP 6**: I removed from further analysis any records relating to telephone numbers that were not wireless at the time of the text messages, as described below in ¶¶ 32-34;

**STEP 7**: I then identified wireless residential telephone numbers that received two or more text messages within a 12-month period after being registered on the NDNCR for 32 days or more. (Verkhovskaya June Report ¶¶ 12-20).

[Ex. H, ¶15]. Verkhovskaya testified that Steps 1 through 6 apply to the putative ATDS and IDNC List Class, and Steps 1 through 7 apply to the putative NDNCR Class. [Ex. J, at 46-48]. Those steps, however, contained errors and, when applied, did not provide the results Verkovskaya opined would. The evolution of, and inadequacies in, Verkhovskaya's methodology is addressed generally below:

| | **10/20/20 Report** | **1/12/21 Report** | **1/12/21 Supplemental Report (1/15)** | **6/9/21 Report** | **9/2/21 S&R Report** |
|---|---|---|---|---|---|
| **Step 1** (Remove businesses) | Removed business numbers that were listed in Honda Contact file | Same as 10/20/20 Report | Same as 10/20/20 Report | Same as 10/20/20 Report | Added to 1/12/21: Use of Service Report business numbers, use of list of potential business names to exclude. Manual review performed. |
| **Step 2** (Limit to specific text messages) | Not performed | Not performed | Not performed | Remove any texts that were not in Table 1 and Table 2 | Same as 6/9/21 Report |
| **Step 3** (Use of keywords) | Only removed words "Yes" and "Stop" | Additional Key words added referenced above | Same Key words as 1/12/21 Report | Same Key words as 1/12/21 Report | Same Key words as 1/12/21 Report |
| **Step 4** (Exclude inbound) | Not performed | Not performed | Not performed | Removed any remaining inbound texts | Same as 6/9/21 Report |
| **Step 5** (Exclude "Failed") | Not performed | Removed "Failed" text messages | Same as 1/12/21 Report | Same as 1/12/21 Report | Same as 1/12/21 Report |
| **Step 6** (Only include wireless | Not performed | Not performed | Not performed | Not performed | Removed any telephone numbers that |

| phone numbers) | | | | | were not wireless. |
|---|---|---|---|---|---|
| **Step 7** (2+ in 12 months) | NDNCR analysis not limited to only wireless numbers | Introduced use of LexisNexis to determine if non-residential number | Same as 1/12/21 Report | Same as 1/12/21 Report | Same as 1/12/21 Report |
| **NDNCR Results** | 933 | 433 | 639 | 965 | 422 |
| **IDNC Results** | Not performed | Introduced IDNC Class and results 3,406 | 3,406 | 3,406 | No results of number count |
| **ATDS Results** | Not performed | Not performed | Not performed | Introduced Wireless (ATDS) Class but not results/number | No results or number count as 6/9/21 Report |

[*See also*, Exs. Q, R]. As demonstrated by the chart above, Verkhovskaya's continued modification to her methodology directly impacted the results of the NDNCR putative class. Verkhovskaya testified that she implemented an even more conservative approach in her S&R Report compared to her prior reports to address the concerns raised by Sponsler and Smith. [Ex. J, at 9-13; see also, Ex. H, ¶1]. Of note, Verkhovskaya received no new information between issuing the June 9, 2021 Report and the S&R Report other than receiving Lexus's experts' reports in August of 2021. Without any new information other than the explicit identification of various flaws in her methodology, Verkhovskaya revised her methodology that ultimately decreased the results of the putative NDNCR putative class members by nearly 56.5% from 965 to 422. Nevertheless, and as addressed by Smith's December 2021 Report, there were still flaws and errors within the methodology. [Ex. R]. Additionally, Verkhovskaya's S&R Report completely failed to apply the new methodology and determine whether the more conservative approach impacted the results of either the IDNC List Class or the ATDS Class. [Ex. J. p. 51].

Moreover, Verkhovskaya's S&R Report did not resolve the examples of data and code errors identified in Smith's August 11, 2021 Report by correcting the flawed methodology. To the

contrary, Verkhovskaya applied manual steps to remove business names that were included within the putative NDNCR class that should have been excluded as demonstrated within Smith's August 2021 Report. [Ex. Q, ¶¶ 30-35]. To further exemplify the inconsistencies and contradictory statements provided by Verkhovskaya, during her supplemental deposition she testified that "manual review" of the data results was not required. [Ex. J, at 24-25]. However, the data provided in support for Verkhovskaya's Report evidenced in the actual code (line 603) the statement "manual work in excel". [Ex. R, ¶¶ 12-13 and Ex. B to Ex. R, line 603]. It is clear that Verkhovskaya was either unaware of manual work being performed by her staff or she failed to acknowledge the affirmative steps taken to manufacture the results within her reports to correct prior mistakes identified by Smith.

Another instance of the methodology's unreliability is the example discussed during Verkhovskaya's supplemental deposition regarding the exclusion of the telephone number that ended in 0169 from the NDNCR putative class. [Ex. J, at 39-43]. According to the data submitted in support of the S&R Report, the telephone number ending in 0169 was removed from the putative NDNCR class; however, applying the S&R Report's 7 Step methodology, the number should have been included within the putative class. [*Id*]. Verkhovskaya had the opportunity to review the data during her supplemental deposition and apply each step of her methodology, but she ultimately was unable to opine on why 0169 was removed from the NDNCR putative class [*Id.* at 39-43 ("I do not know why this number was removed based on the seven steps.")]. This is a prime example of the unreliability of Verkhovskaya's methodology.

Not only is Verkovskaya's methodology unable to ascertain class membership, but her methodology cannot even (consistently) prove that the named Plaintiffs are actual class members. Throughout each iteration of her report from October 2020 through June 2021, Verkhovskaya

included named Plaintiff Greene within the putative NDNCR Class. However, Smith directly identified in both her December 2020 report and August 2021 that Greene should be excluded based upon each reports purported method. [Ex. P, ¶¶ 25-26, 42; Ex. Q ¶ ¶¶ 37-41, 94]. Verkhovskaya's continued inclusion of Greene clearly demonstrated the flawed methodology and inconsistent results throughout her reports. It was not until her issuance of the S&R Report did Verkhovskaya recognize Smith's point and subsequently excluded Greene from the NDNCR Class. It is worthy to note, Verkhovskaya's methodology has ultimately removed named Plaintiffs Watson, Samarghitan, Jackson, and Greene from the putative NDNCR Class.

In addition to her flawed methodology within the June 9, 2021 Report, Verkhovskaya relied upon unknown data to confirm the historical wireless status of the telephone numbers as of the date the text messages were received. [Ex. Q, ¶¶ 76-90]. In her June 9, 2021 Report, Verkhovskaya stated that there is a reliable method to confirm the historical wireless status of the telephone numbers but she failed to provide any details as to this purported reliable method. [*Id*., ¶ 85]. Rather than supporting her unsubstantiated opinion, Verkhovskaya simply assumed every single telephone number that was sent a text from Lexus was a wireless number. [*Id*., ¶ 86]. However, as demonstrated in Figures 25, 26, and 27 of Ms. Smith's August 11, 2021 Report, there are examples of telephone numbers that were indeed not wireless on the date the text message was sent. [*Id*., ¶¶ 86-90]. Verkhovskaya agreed with Smith's determination that the methodology was incorrect and simply (without permission of the Court) modified her methodology again to exclude non-wireless telephone numbers in her results. Ex. H, ¶ 32]. This is another example of Verkhovskaya applying the wrong methodology, only to attempt to correct it once the errors were identified by Smith.

It cannot be disputed that Verkhovskaya has taken every opportunity to amend and modify her methodology to attempt to correct her flawed methodology and circumvent the criticism of

Lexus's expert witnesses. In the end, that Verkhovskaya's multitude of reports, opinions, and data fail to rely upon sufficient data, provide a reliable methodology, and fails to provide the trier of fact any assistance in evaluating whether any particular telephone number could qualify for the putative classes in this case. For those reasons, and those stated by Ms. Smith and Mr. Sponsler, each and every report and opinion issued by Verkhovskaya should be excluded and deemed inadmissible.

C.  LexisNexis Cannot Reliably Determine That A Telephone Number Is Residential Or Non-Residential

Verkhovskaya's methodology includes a step that relies upon information from LexisNexis as to whether each Honda customers' telephone number was publicly registered for business, residential, or governmental purposes also referred in her data as "BusResGov". [Ex. F, ¶¶ 31-36; Ex. G, ¶¶ 17-19; Ex. I at 98-99].

To determine whether a telephone number was "BusResGov", Verkhovskaya set the "needs" and parameters for the identification of the telephone numbers with LexisNexis and LexisNexis, in turn, provided an output of information based upon the "needs" set by the customer. [Ex. U]. Once the output of data was received from LexisNexis, Verkhovskaya's method would include any residential telephone numbers within the putative classes and exclude any business or governmental telephone numbers from the putative classes. [Ex. G, ¶¶ 17-19; Ex. I, at 98-99]. This method is seriously flawed for two reasons: (1) LexisNexis is not capable of providing the classification of telephone numbers that Verkhovskaya is using the information for in her reports, and (2) Verkhovskaya controls how a telephone number with unknown information is categorized. Here, Verkhovskaya set the unknown numbers to be registered as "MLR," meaning "most likely residential," and she included those "MLR" telephone numbers in the putative classes without ever knowing the true purpose of that telephone number. [Ex. I, pp. 162-164].

In a declaration submitted in *Chinitz v. Intero Real Estate Services*, Case No. 5:18-cv-05623-BLF (N.D.Ca)(attached as Ex. T), where Verkhovskaya proposed a similar methodology, Craig L. Davis from LexisNexis stated that "LexisNexis does not have data classifying all telephone numbers as business, residence or government." (Ex. T, ¶ 8). Davis also stated that when a process calls for LexisNexis to return a BusResGov flag on a searched number, but LexisNexis does not have information on the requested telephone number, LexisNexis returns a blank BusResGov value, unless a specific value is requested by the customer (such as Verkhovskaya requesting LexisNexis to return "MLR" if they have no information). [*Id*., ¶¶ 8-9].

Verkhovskaya testified, and as evidenced in the LexisNexis Batch Design and Transfer Document, she set the parameters for the "Needs and Issues". [Ex. I, at 159-164; Ex. U, pp. 3-4]. The last parameter in the "Needs and Issues" set a rule that any telephone number that cannot be categorized as business, residential, or governmental will be defaulted with the value "MLR." [Ex. I, pp. 162-164; Ex. U, pp. 3-4]. Verkhovskaya included those MLR telephone numbers within the putative classes, and, did so, without rhyme or reason, simply because she thought it the most appropriate methodology. [Ex. I., p. 164]. Smith addresses in great detail, with examples, how the parameters set by Verkhovskaya are unreliable, improper, and misleading as well as part of Verkhovskaya's changing methodology. [Ex. Q, ¶¶46-56]. Importantly, only 44 of Verkhovskaya's 422 residential NDNCR numbers in the S&R Report were actually reported as being residential by LexisNexis. [Ex. R, ¶ 16]. Astonishingly, LexisNexis could not identify the remaining 378 telephone numbers (90% of the putative class) as either business or residential as indicated in the data as "No LexisNexis Data Records", yet Verkhovskaya included those telephone numbers in the putative NDNCR class. [*Id*]. Verkhovskaya inappropriately throws caution into the wind by including telephone numbers as putative class members without relying

upon any reliable data. For these reasons, Verkhovskaya's methodology should be excluded and deemed inadmissible as it relies upon unsupported and insufficient data that cannot stand up to independent testing in the TCPA field.

D.  Neither LexisNexis Nor Any Third Party Database Can Reliably Determine The User Or Subscriber Assigned To A Telephone Number At A Specific Time.

Verkhovskaya's reliance upon LexisNexis for a "reverse-lookup" method to ascertain members of a putative class has been found unreliable and should be deemed inadmissible.  To that end, application of a reverse-append methodology was specifically criticized and excluded by federal courts. *See Hunter v. Time Warner Cable, Inc.*, 2019 WL 3812063 (S.D.N.Y. Aug. 14, 2019); *Carrol v. SGC Automotive Services, Inc.*, 2020 WL 7024477 (M.D. La. Nov. 30, 2020).

The experts in both *Hunter* and *Carrol*, like here, employed the "reverse-lookup" methodology as a means of ascertaining the class members in a putative class action under the TCPA. *Hunter*, 2019 WL 3812063 at *15; *Carrol*, 2020 WL 7024477 at *15-16. In rejecting the methodology, both courts accepted the proffered Declaration of a LexisNexis representative that stated LexisNexis is wholly unreliable for "reverse-lookup" – used in the same context as Verkhovskaya. *Hunter*, 2019 WL 3812063 at *30; *Carrol*, 2020 WL 7024477 at *14-15. The LexisNexis declarant explained that the Lexis database "cannot be used to determine definitively the subscribers or customary users of a telephone number on a current or historical basis. Nor can [it] be used to identify when a telephone number was reassigned from one person to another, or when the customary user of a phone number changed." *Id.*[7] Thus, Verkhovskaya's reports and testimony lack any tenable basis or foundation for resolving the systemic problem of identifying historic subscribers and users of telephone numbers.

---

[7] The Declaration of Mary Hillis and Marc Bacon – LexisNexis representatives – are sealed for the public's view. (*See Hunter*, Civil Action No. 15-CV-06445 at ECF Nos. 241 and 241).

Verkhovskaya has not and cannot produce any objective facts to verify her methodology that LexisNexis accurately identifies historic telephone subscribers and users within a failure rate of 3-14%, which even if true does not prove that her method is reliable. ([Ex. D, ¶ 43]. It is important to note that in addition to this Court rejecting the reverse-append methodology in *Hunter*, this Court further found that the same reliability issues are equally applied to other third-party databases as well. *Hunter*, 2019 WL 3812063 at *31. This Court stated: "Other reverse-look up database providers acknowledge similar short comings in their products and the FCC has expressly recognized that 'commercial databases' that track phone number assignment 'are not comprehensive.'" *Id*.

Other courts have similarly rejected the use of such reverse-append tools to identify the users of particular phone numbers for the sake of determining class members. *See*, *e.g., Balshmiter v. T.D. Auto Fin. LLC*, 303 F.R.D. 508, 524-525 (E.D. Wis. 2014); *Jacobs v. Quicken Loans, Inc.*, 2017 WL 4838571 at *3 (S.D. Fla. Oct. 19, 2017); *Sherman v. Yahoo! Inc.*, No. 2014 WL 5604400 at *6 (S.D. Cal. Sept. 23, 2015). For these reasons, Verkhovskaya's methodology is unreliable every step of the process and must be deemed inadmissible in its entirety. *In re Paoli R.R. yard PCB Litig.*, 35 F.3d 717, 745 (3d Cir. 1994).

## **CONCLUSION**

For all the foregoing reasons, Defendant respectfully requests this Court grant its motion to exclude Plaintiffs' expert witnesses', Randall Snyder and Anya Verkhovskaya, reports and testimony in their entirety, and; (2) such other and further relief as this Court deems just and proper.

Dated:  New York, New York
            February 16, 2022

Respectfully submitted,

LONDON FISCHER LLP

*Jason M. Myers*

By:     _____
         Jason M. Myers, Esq.
         59 Maiden Lane
         New York, New York 10038
         (212) 972-1000
         JMyers@ londonfischer.com

         STEVENS & LEE, P.C.
         Stephanie Lopez
         669 River Drive, Suite 201
         Elmwood Park, New Jersey 07407
         (201) 857-6768
         stephanie.lopez@stevenslee.com

         *Counsel for Manhattan Luxury Automobiles Inc.*
         *d/b/a Lexus of Manhattan*

To:     Daniel Zemel (Plaintiff's Counsel)(via ECF)