**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| BRIAN WATSON, DANIEL SAMARGHITAN, ANNMARIE GREENE f/k/a ANNMARIE MOHAMMED, JOSE ESPINAL, LYMELL JACKSON, individually and on behalf of all others similarly situated, | )<br>)<br>)<br>)<br>) |
| Plaintiffs, | ) |
| vs. | )<br>)<br>) |
| LEXUS OF MANHATTAN, | )<br>) |
| Defendant. | ) |

Case No.:  20-cv-04572

**OPPOSITION TO DEFENDANT'S MOTION TO EXCLUDE RANDALL A. SNYDER AND ANYA VERKHOVSKAYA**

Dated: March 16, 2022

**ZEMEL LAW, LLC**

/s/ *Daniel Zemel*
Daniel Zemel, Esq.
660 Broadway
Paterson, New Jersey 07514
(867) 227-3106
dz@zemellawllc.com
Attorneys for Plaintiffs

# <u>TABLE OF CONTENTS</u>

I.    INTRODUCTION ...................................................................................................... 1

II.   LEGAL STANDARD ............................................................................................... 1

III.  ARGUMENT ........................................................................................................... 3

   A.   SNYDER SHOULD NOT BE EXCLUDED AS AN EXPERT ......................................... 3

     1.    Snyder's June 2021 Report Does Not Contain Misstated Legal Conclusions ............ 3

     2.    Snyder's June 2021 Report and Related Opinions Are Reliable ................................. 3

     i.    Snyder's Analysis Properly Relied on Version 1's Technical Documents, and the Lists Created Through LOM's Use of the Zipwhip System and Will Assist The Jury ...... 4

     ii.   Snyder Distinguished Between the Business and Economy Packages .................... 8

     iii.  Snyder Did Not Need to Test Version 1 of the System to Reach his Opinion ........ 8

     iv.   Snyder's Opinions Are Proper and Will Assist the Trier of Fact ........................... 10

     3.    LOM Fails To Show That Snyder's Opinions Have Been Previously Excluded For Similar Grounds ................................................................................................................ 11

   B.   VERKHOVSKAYA SHOULD NOT BE EXCLUDED AS AN EXPERT .................... 14

     1.    Verkhovskaya's Opinions Relating To The Internal Do Not Call List Should Not Be Excluded ........................................................................................................................... 15

     2.    Verkhovskaya's Opinions List a Clear Methodology for Class Identification .......... 16

     i.    Supplemental Reports ................................................................................................ 18

     ii.   Application of S&R Report Methodology to ATDS and IDNC Classes ................ 19

     iii.  Verkhovskaya's Did Not Manufacture Results Through "Manual Review" .......... 19

     iv.   0169's Exclusion from the Class List .................................................................... 20

     v.    Named Plaintiff Exclusion ....................................................................................... 21

     vi.   Business Record Methodology ................................................................................ 21

     3.    Verkhovskaya's Use of LexisNexis Within Her Methodology for Determining Residential Telephone Numbers is Reliable and Court Approved ...................................... 22

     4.    The "Reverse Lookup" To Identify Cell Phone Users is Irrelevant ........................... 23

IV.   CONCLUSION ...................................................................................................... 25

# **TABLE OF AUTHORITIES**

Abante Rooter & Plumbing, Inc. v. Alarm.com Inc., 2017 U.S. Dist. LEXIS 69307 (N.D. Cal.,

    2017), amended 2018 U.S. Dist. LEXIS 13271 (N.D. Cal. 2018);.................................... 14, 23

Abante Rooter and Plumbing, Inc., et. al. v. Alarm.com Incorporated, et. al., 2019 U.S. Dist

    LEXIS 132078 (N.D. Cal. 2018) ............................................................................... 9, 13

Betterbox Commc'ns Ltd. v. BB Techs., Inc., 300 F.3d 325 (3d Cir. 2001)............................... 17

Bourjaily v. United States, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987) ................... 3

Chinitz v. Intero Real Estate Servs., 2020 U.S. Dist. LEXIS 247921 (N.D. Cal. 2020) ........ 14, 22

City of Pomona v. SQM N. Am. Corp., 750 F.3d 1036 (9th Cir. 2014)........................................ 2

Cordoba v. DIRECTV, LLC, 320 F.R.D. 582 (N.D. Ga. 2017). .................................................. 23

Culley v. Lincare Inc. 2016 U.S. Dist. LEXIS 105704 (E.D. Cal. 2016). ................................... 14

Delgado v. Unruh, 2017 U.S. Dist. LEXIS 35790 (D. Kan. 2017) ............................................. 17

Dominguez v. Yahoo!, Inc., 2017 WL 390267 (E.D. Pa. 2017), aff'd, 894 F.3d 116 (3d Cir.

    2018) ..................................................................................................................... 12

Glasser v. Hilton Grand Vacations Co., 2018 WL 4565751 (M.D. Fla. 2018) ........................... 14

Hagood v. Portfolio Recovery Assocs., LLC, 2020 U.S. Dist. LEXIS 47507 (S.D. Ill. 2020).... 12

Hangartner v. Provident Life & Accident Ins. Co., 373 F.3d 998 (9th Cir. 2004). ................... 2, 6

ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc., 198 F.Supp. 2d 598 (E.D. Pa. 2002) ................ 3

In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. v. Countrywide Fin. Corp., 984 F. Supp.

    2d 1021 (C.D. Cal. 2013)........................................................................................... 17

Koppell v. New York State Bd. of Elections, 97 F. Supp. 2d 477 (S.D.N.Y. 2000)..................... 3

Krakauer v. Dish Network, L.L.C., 2015 U.S. Dist. LEXIS 118858 (M.D.N.C. 2015)......... 20, 23

Kumho Tire Co. v. Carmichael, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999).... 2, 17

Legg v. Voice Media Grp., Inc., 2014 WL 1767097 (S.D. Fla. May 2, 2014) ............................ 13

Marshall v. CBE Grp., Inc., 2018 WL 1567852 (D. Nev. 2018) .................................................. 13

McMillion, et al. v, Rash Curtis & Associates, 2019 U.S. Dist. LEXIS 76332 (N.D. Cal 2019). 14

Morgan v. On Deck Capital, Inc., Case No. 3:17-cv-00045 (W.D. Vir. 2019) ............................ 9

Padillas v. Stork-Gamco, Inc., 186 F.3d 412 (3d Cir. 1999) ........................................................ 3

Panzarella v. Navient Sols., LLC, 2020 WL 3250508 (E.D. Pa. 2020) ........................................ 14

Pineda v. Ford Motor Co., 520 F.3d 237 (3d Cir. 2008). .............................................................. 1

R.C. Olmstead, Inc., v. CU Interface, LLC, 606 F.3d 262 (6th Cir. 2010) .................................. 18

Ramos v. Hopele of Fort Lauderdale, LLC, 334 F. Supp. 3d. 1262 (S.D. Fla. 2018) ................. 13

Robidoux v. Celani, 987 F.2d 931 (2d Cir. 1993). ....................................................................... 19

Satterfield v. Simon & Schuster, Inc., 569 F.3d 946 (9th Cir 2009) ............................................ 14

Shelton v. Fast Advance Funding, LLC, 378 F. Supp. 3d 356 (E.D. Pa. 2019) .......................... 16

UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres, 949 F.3d 8255 (3d Cir. 2020)... 2

Williams v. PillPack LLC, 2021 U.S. Dist. LEXIS 27496 (W.D. Wash. 2021) ......................... 23

## I.     <u>INTRODUCTION</u>

Plaintiffs Brian Watson, Daniel Samarghitan, AnnMarie Greene, Jose Espinal and Lymell Jackson, through their attorneys, have brought claims on behalf of themselves and the putative class, alleging violations by Defendant of the Telephone Consumer Protection Act, 47 U.S.C. § 227, *et. seq.* ("TCPA"). In support of their claims, Plaintiffs hired two experts. Randall A. Snyder ("Snyder") provided expert reports and opinions on the issues of whether the system utilized by Lexus of Manhattan ("Lexus" or "LOM"), Zipwhip, Inc.'s ("Zipwhip") platform, is an automatic telephone dialing system ("ATDS"). Anya Verkhovskaya ("Verkhovskaya") provided expert reports on the issue of identifying and ascertaining each class member. Both experts have provided more than one report. Snyder provided a report before *Facebook* changed the landscape of TCPA litigation, and after in light of the new standard. Verkhovskaya issued five reports in total. Numerous supplemental reports were necessary because Defendant continued to provide more text message data that changed the results due to no fault of Verkhovskaya. The final report was created to correct a coding error, and address the critiques of Defendant's expert witnesses. Defendant improperly seeks to exclude both experts in their entirety which is overbroad and improper and should not be allowed. Plaintiffs respectfully requests the Court to deny Defendant's motion and allow Plaintiffs to present their experts at trial.

## II.     <u>LEGAL STANDARD</u>

In *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S. Ct. 2786, 125 L.Ed. 2d 469 (1993), the U.S. Supreme Court expounded on the requirements of Rule 702, establishing that the court must function as a "'gatekeeper'" to ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable. *Pineda v. Ford Motor Co.*, 520 F.3d 237, 243 (3d Cir. 2008). A "trial judge has three duties: (1) confirm the witness is a qualified

expert; (2) check the proposed testimony is reliable and relates to matters requiring scientific, technical, or specialized knowledge; and (3) ensure the expert's testimony is 'sufficiently tied to the facts of the case,' so that it 'fits' the dispute and will assist the trier of fact." *UGI Sunbury LLC v. A Permanent Easement for 1.7575 Acres*, 949 F.3d 8255, 832 (3d Cir. 2020). "The text of Rule 702 contains no exception to these requirements, so if they are not satisfied, an expert cannot testify before the 'trier of fact.'" *Id.*

In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S. Ct. 1167, 143 L. Ed. 2d 238 (1999) the U.S. Supreme Court clarified that "the *Daubert* gatekeeping obligation applies not only to 'scientific' testimony, but to all expert testimony" and insures the reliability and relevancy of the expert testimony whether the expert is "basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 138, 152.

An expert may rely on the kinds of facts and data experts in the field would typically rely on, even if those facts or data would be otherwise inadmissible. Fed. R. Evid. 703. The district court's role is to "screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable." *City of Pomona v. SQM N. Am. Corp.,* 750 F.3d 1036, 1044 (9th Cir. 2014) (quoting *Alaska Rent-A-Car*, 738 F.3d 960, 969 (9th Cir. 2013)). Challenges regarding the nature of evidence relied the expert relied on go "more to the 'weight' of [the expert's] testimony—an issue properly explored during direct and cross-examination." *Hangartner v. Provident Life & Accident Ins. Co.,* 373 F.3d 998, 1017 n.14 (9th Cir. 2004). This is particularly true where the expert's analysis relies in part on the expert's knowledge of an industry. *Id.*

2

Thus, under *Daubert,* there are three discrete inquiries: qualifications, relevance, and reliability and the party offering such testimony has the burden of establishing these factors. *See Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579, 592 n.10, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993); *Koppell v. New York State Bd. of Elections*, 97 F. Supp. 2d 477, 479 (S.D.N.Y. 2000); *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987). "The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence." *ID Sec. Sys. Can., Inc. v. Checkpoint Sys., Inc.*, 198 F. Supp. 2d 598, 601-02 (E.D. Pa. 2002) (*citing Padillas v. Stork-Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999)).

## III.   ARGUMENT

Defendant does not challenge the qualifications of either Mr. Snyder or Ms. Verkhovskaya. Both experts provided detailed resumes of their qualifications with their expert reports, and have been found qualified by numerous courts. Nor does Defendant challenge relevance, as the opinions rendered are undoubtedly relevant. Instead, Defendant's challenges pertain to reliability. Defendant Lexus fails to sufficiently show that Plaintiffs' experts and expert reports are unreliable and as such, Defendant's Motion to Exclude should be denied.

### A.   SNYDER SHOULD NOT BE EXCLUDED AS AN EXPERT

#### 1.   Snyder's June 2021 Report Does Not Contain Misstated Legal Conclusions

Defendant seeks to exclude Mr. Snyder's opinions in his January 2021 expert report because they rely on pre-*Facebook* definition of an automatic dialing system. Mr. Snyder provided a new expert report in June 2021, which Plaintiff exclusively relies on here, rendering this moot . Defendant's Exhibit C at 28:20-21, 29:17-30:2.

#### 2.   Snyder's June 2021 Report and Related Opinions Are Reliable

3

Defendant presents a number of unsupported and factually inaccurate bases for why Mr. Snyder's expert opinions should be excluded. To discredit Snyder's experience and expertise, Defendant focuses on the reliability aspect of Mr. Snyder's in three ways. First, Defendant attempts to erroneously claim that Snyder only analyzed the wrong version of the platform - Zipwhip Version 2, as opposed to Version 1—the version used by LOM to send the text messages. Additionally, LOM argues that Snyder failed to distinguish between the Zipwhip Economy Package used by LOM and an alternative Business package. Throughout these allegations, LOM argues that Snyder "failed to consider key evidence" by not reviewing or contradicting the testimony of James Lapic, the Chief Technology Officer at Zipwhip. However, this is not correct, and Snyder specifically notes that he did review Lapic's testimony and did take it into consideration in forming his opinions. *See* Defendant's Exhibit B, Snyder Expert Report, pg. 5, 21, 23. Next, Defendant claims Snyder's report should be excluded simply because he did not test the platform firsthand and third, because Snyder's testimony has been excluded in other cases involving ATDS determinations. All of these arguments arise from Defendant's cherry picking of specific verbiage during Snyder's deposition, taken out of context, and blatant disregard for the contents of Snyder's Report and his testimony regarding his opinions. Defendant has simply failed in its burden to show that Snyder's report and opinions should be stricken and their motion to exclude Mr. Snyder should be denied.

        i.      <u>Snyder's Analysis Properly Relied on Version 1's Technical Documents, and the Lists Created Through LOM's Use of the Zipwhip System and Will Assist The Jury</u>

Snyder's expert report and opinion are clear. Snyder opined "that the Defendant utilized equipment which has the capacity to store or produce telephone numbers to be called, using a random or sequential number generator, and to dial such numbers. In addition, it is my opinion

that the Defendant utilized equipment which has the capacity to store telephone numbers using a random or sequential number generator and dial them automatically. I base this opinion on my knowledge, education, experience, expertise, training, and the evidence I have reviewed." To challenge this, Defendant seeks to undermine Snyder's opinion by stating that Snyder only reached this conclusion by reviewing documents and data for Version 2 of the system, which was indisputably not used by LOM.

Snyder provided detailed insight on the documentation and analysis that led to his conclusions, all of which came from Version 1. Within his expert report, Snyder clearly identified 21 documents that were used in reaching his conclusions, specifically listing, among other documents produced by Zipwhip, the Zip-Whip Multi-User Quick Start Guide, Version 1, Zipwhip Windows Desktop App and Zipwhip Business Texting Directions and Tips, which specifically pertain to Version 1, as well as the deposition testimony of Mr. Lapic. Defendant's Exhibit B, pg. 4-5. Defendant's vague allegation of convoluted data and sources is unfounded, given that its experts also based their opinions on the same documents produced by Zipwhip, and Snyder has clearly laid out the documents reviewed and discussed in his expert report.

Further, LOM's attempts to create confusion between whether the technical documents reviewed by Snyder related to Version 1 or Version 2 are unfounded. During his deposition, Snyder admitted that certain technical documents from the Zipwhip platform did not identify whether they referred to Version 1 or Version 2. However, the testimony from James Lapic made clear that the key technical documents relied on by Snyder did in fact relate to Version 1 of the system. Exhibit 1, Snyder Deposition, 164:17-165:21; Exhibit 2, Deposition of James Lapic, 68:10-70:4. Further, during Lapic's testimony, Lapic repeatedly distinguished between the capabilities of Version 1 and Version 2. *See* Exhibit 2, 75:12-77:25. Snyder also repeatedly testified in his deposition

regarding his reliance on Lapic's testimony, as well as consistently explaining the difference between Version 1 and Version 2, confirming he did in fact take into consideration Lapic's testimony and the documents concerning Zipwhip's functionality. *See* Exhibit 1, e.g. 61:16-62:2, 68:7-67:12; 69:7-15. Snyder also made clear that his opinion was based on the system used between 2013 and 2017, and described the systems capabilities that related to Version 1. Exhibit 1, Snyder Deposition, 75:12-76:13. At most, the confusion created by Defendant goes to the weight of the evidence and not the admissibility. *Hangartner*, 373 F.3d 998, 1017 n.14 (9th Cir. 2004).

While explaining the data and analysis relied on to reach his opinions, Snyder spoke to Zipwhip's capabilities in Version 1. Specifically, Snyder opined in Version 1, the platform provided for the capability to cut, paste, and ***store*** whole columns of data in sequential order (e.g. customer information such as phone numbers and names). *Id.,* 99:21-102:5. Further, he explained that in Version 1, the system creates a chronological order sequence for sending text messages, in circumstances where resending of messages is necessary. *Id.* Finally, Snyder opined that Version 1, allowed for sending of messages through sequential transmission based on the sequence ID associated with each consumer's phone number. *Id.*

Snyder also specifically discussed the analysis of LOM 5A to reach the conclusion that the Zipwhip platform could store and dial numbers sequentially. LOM 5A was the initial list of text messages. *See* Exhibit 1, Deposition of Randall Snyder, 65:23-66:7. Snyder testified that he analyzed "transmission and egress time that the messages were sent, along with the ID numbers for those messages," and that "these were the two main parameters and fields I looked at." *See* Exhibit 1, Snyder Deposition, 66:8-23. Additionally, Snyder relied on ML 250 and the transmission data in this chart as well in reaching his conclusions. Even further, Snyder testified that he relied on Lapic's testimony concerning the sequencing abilities of the platform. Exhibit 1,

Snyder Deposition, 68:7-69:2. **Through this analysis of how the system was used in this very case**, Snyder opined that the text messages were transmitted in "defined programmatic sequence whether chronologically or by ID number." *Id.,* 67:13-25.

LOM seeks to contradict Snyder's opinion by pointing to specific pieces of testimony from the Lapic deposition which were specifically created to contest Zipwhip's capability to meet the ATDS definition. In this regard, LOM cites to statements from Lapic such as the lack of ability to sequentially produce numbers, dial numbers sequentially, lack of ability to story numbers, etc.[1] At best, this goes to the weight of Snyder's opinion, not the admissibility. A prior defendant's testimony concerning system specification does not trump the admissibility of expert opinion that comes from analysis of technical manuals, and how the system was in fact used by LOM in this case. In fact, Snyder opined that the technical materials provide objective information about the system, which is more comprehensive than subjective witness testimony. *See* Exhibit 1, 74: 4-21.

Snyder provided clear and direct insight into his analysis that determined the system acts as a sequential number generator. Relying on LOM 5A, Snyder testified that there is a sequence ID associated with each number, and that the numbers are transmitted sequentially based on this ID. Exhibit 1, 138:3-140:16; 99:21-102:15. Relying on LOM 5A, Snyder further testified that the retry queue, which is created when there is a transmission failure, retransmits the text messages in chronological order based on a chronological sequence. Exhibit 1, 133:10-134:4; 99:21-102:5. Snyder also testified that the numbers are stored in a particular sequential order, utilizing the drag and drop function to import contacts. *Id.* These opinions clearly arise from LOM 5A, ML 250 and

---

[1] Lapic's testimony was provided in a sister case, where Zipwhip was a named defendant. See Schleifer v. Lexus of Manhattan, et al., Civil Action No. 17-cv-08789 (AJN). There, it was clearly within Zipwhip's interest for their system to not to meet the ATDS definition, and thus, absolve them of liability, which should go to the veracity Mr. Lapic's testimony. Snyder is under no obligation to accept Mr. Lapic's testimony without any scrutiny to possible bias, especially in light of the fact the Zipwhip manuals themselves support Snyder's opinions. See Exhibit B, 17-20.

Zipwhip's technical manuals. Exhibit 1, 99:21-102:5. Thus, Snyder's analysis relied on relevant data that is clearly applicable to Version 1 and LOM's use of the system.

        ii.      <u>Snyder Distinguished Between the Business and Economy Packages</u>

LOM also seeks to create confusion between the "business package" and the "economy package" offered by Zipwhip, as LOM only utilized the "economy package." However, Snyder's opinion clearly articulated that the "economy package" utilized by LOM acted as a sequential number generator. *See* Exhibit 1, Snyder Deposition, 135:4-140:2; 145:14-24. This was supported by analyzing the very lists created by LOM's usage of the system, LOM 5A and ML 250. Defendant's Exhibit B, 4-5.

LOM argues that Snyder disregarded Lapic's testimony to reach conclusions that LOM does not like; and therefore, Snyder's opinion must be excluded. Critically, Snyder repeatedly testified that his opinion did in fact rely on Lapic's deposition testimony, data manuals, and the excel worksheets created by LOM's use of the system. LOM argues that because the Zipwhip "economy package" did not have as many features as the "business package," it should not be considered an ATDS. Regardless of "economy package" or "business package," both packages used the same system and Snyder specifically analyzed and relied on LOM 5A and ML 250 which show that the "economy package" had the necessary storing and generating capabilities to opine that the system has the capacity to store numbers sequentially, and to dial such numbers. *See* Defendant's Exhibit B, 22-23.

        iii.      <u>Snyder Did Not Need to Test Version 1 of the System to Reach his Opinion</u>

LOM also argues that Snyder's opinion should be discarded because he did not personally test Version 1 as a system user; however, the fact that Snyder did not physically inspect the system in question is irrelevant to his understanding of its capacity and how it operates. The opinions

reached by Snyder arise from the specific documentation of how the system was utilized by LOM itself and direct system use is not a requirement.

Numerous cases have held that personal testing of a program is not a bar to qualifying an expert to testify and specifically held that Mr. Snyder could testify despite not examining the machine and only reviewing the technical manuals. *See Abante Rooter and Plumbing, Inc., et. al. v. Alarm.com Incorporated, et. al.,* 2019 U.S. Dist. LEXIS 132078, *26 (N.D. Cal. 2018) (The fact that Plaintiffs' expert Randall Snyder did not physically inspect the Ytel Dialer, but only reviewed the capabilities literature provided by the manufacturer of the Ytel Dialer and information from witnesses who used the device does not preclude Mr. Snyder's testimony about its nature.); *Morgan v. On Deck Capital, Inc.,* Case No. 3:17-cv-00045 (W.D. Vir. 2019) (Given the reliable assertion that the manuals reviewed by Snyder are accurate representations of the dialer "provides the necessary predicate for Snyder's factual basis to suffice for the conclusions reached about the [] dialer.").

Again, Snyder specifically reviewed and relied on LOM 5A and ML 250 in reaching his conclusions. Snyder specifically analyzed how the transmission and egress data from these charts demonstrated the system's capabilities by reviewing LOM's own usage of the system. Snyder also specifically relied on the storing capabilities of the system as clearly articulated within Zipwhip's own technical manuals. Accordingly, there is no reason that Snyder's lack of system use must act as a preclusion to the admissibility of his expert opinion when the entirety of his opinion comes from the system's capabilities and how the system was actually used in this case.

During deposition, Snyder also discussed whether utilizing the system would provide greater insight into the system's capabilities. Snyder testified that the technical manuals and excel sheets provided more insight because it provides more information about the back-end software

that you can't really glean from using the front-end user application. Exhibit 1, 169:4-22. Snyder also provided an example of this concerning the retry mechanism which is something that only occurs on the back end, and the front-end user would be unaware of. *Id.,* 169:23-170:21. Indeed, the retry mechanism is only seeable on ML 250, by reviewing how the system acted at time of usage.  Accordingly, Snyder has reviewed sufficient data and details to render his opinion based on the system's technical specifications and technical capabilities.

iv.     <u>Snyder's Opinions Are Proper and Will Assist the Trier of Fact</u>

In its brief, LOM takes Snyder's testimony out of context to create the illusion of confusion. Snyder's opinions, throughout his report are absolutely clear. Snyder clearly articulates the system's capabilities, as utilized by LOM. Snyder also clearly articulates the analysis conducted to reach his conclusions. No jury member will be confused by Snyder's direct testimony.

First, Defendant states that because Snyder specifically "conceded 'the platform isn't a sequential number generator'" it would be confusing for the jury to hear Snyder testify that the system is capable of sequential number generation. However, computer programs and systems are technical in nature and require technical analysis. Snyder clearly explained that if a particular software function, like the sequential number generator, is required for the overall Zipwhip application to operate properly, **it is part of that application**. Thus without sequential number generating function, the application will not work and hence, it is part of the application. Snyder explains that the Zipwhip application has functions within it that provide sequential number generation for the recipient list of telephone numbers and the order by which messages are sent to those numbers. *See* Exhibit B. 20-24; Exhibit 1, 135:4-140:16.

What renders the application a sequential number generator is the order by which the numbers are stored in the Zipwhip application to determine the order by which messages are sent

to a particular number. 137:9-16. The sequential number generator for the numbers stored there is either part of Excel, part of a retry queue or part of managing the contacts. *Id.* Further, in reviewing LOM5A and ML 250, Snyder explained the numbers were put into sequential order using a sequence ID and then transmitted based on sequence ID, so each transmitted message is associated with a sequential identifier that appears to be ascending and incremented by one. *Id.,* 139:12-140:16. Each drag and drop of contacts gets a particular sequential ID rather than each discrete message. *Id.,* 141:7-13. Explaining the distinctions of this system and how it generates sequential numbers to the jury will require expert testimony.

Second, Defendant takes issue with specific "lay opinions" provided by Snyder. During deposition testimony, whenever pressed by Defendant to explain the legal definition of an ATDS, Snyder stated he could only provide his lay opinion based on what he's told by counsel. Similarly, when pressed on how the Supreme Court interprets an ATDS after *Facebook v. Duguid*, Snyder provided his lay opinion. But Snyder was not retained to provide the legal interpretation of an ATDS as experts may not offer legal conclusions. Nor was he retained to legally analyze *Facebook v. Duguid*. Snyder was retained to determine whether Zipwhip's system allowed for sequential number generation, and the storing of those numbers sequentially. In these pieces of opinion and testimony, Snyder provided expert opinion based on specialized technical knowledge of phone systems and computer programming manuals. Thus, his key conclusions are not "lay opinions." This is appropriate as Snyder's expected opinion testimony is designed to "embrace[] an ultimate issue of fact" rather than "state[] a legal conclusion."

### 3. LOM Fails To Show That Snyder's Opinions Have Been Previously Excluded For Similar Grounds

Defendant's attempt to cherry-pick a handful of cases which excluded Mr. Snyder's testimony does not mean that his testimony is not relevant in this matter, or that there are not

equally as many cases where his expert opinion has been considered admissible. Defendant cites to a few cases which can be easily distinguished from the factual circumstances in this case. First, Defendant points to *Hagood v. Portfolio Recovery Assocs., LLC*, where Snyder's testimony was excluded because it was "not based on sufficient facts or data." 2020 U.S. Dist. LEXIS 47507, at *9 (S.D. Ill. 2020). In *Hagood*, Snyder testified that the only basis for his opinion that the Avaya system can store or produce phone numbers using a random number generator is the ability of the Windows operating system to generate random numbers, which could potentially be said for *any* dialing system hosted on a computer with a Windows operating system. *Id.* Thus, the court held that Snyder's "overbroad, generalized assertions" regarding a system's ability to generate random numbers was not admissible. Here however, Snyder's opinions are based on the technical manuals and documents produced by Zipwhip, Lapic testimony, and excel charts generated by LOM's usage of the system. Thus, the evidence relied on here is clearly sufficient.

Similarly, in *Dominguez v. Yahoo!, Inc.*, 2017 WL 390267 at *20 (E.D. Pa. 2017), *aff'd*, 894 F.3d 116 (3d Cir. 2018), where Snyder's opinions were excluded because his "methodologies [were] not testable" and "not reliable," Snyder again relied only on that fact that "[t]he ability to generate random numbers is a fundamental function inherent in information technology computer systems employing the most common operating systems, security protocols and encryption" without "explanation of how the Email SMS System actually did or could generate random telephone numbers to dial." *Dominguez v. Yahoo, Inc.,* 894 F.3d 116, 120 (3d Cir. 2018). In this case however, Snyder directs the court to LOM 5A and ML 250 which directly identify the sequential ID, transmission/egress time messages were sent, and the retry queues which show the system capabilities. Exhibit 1, 99:21-102:19.

Defendant also cites to *Marshall v. CBE Grp., Inc.*, 2018 WL 1567852 at *8 (D. Nev. 2018) for the premise that the court refused the plaintiff's reliance on Snyder's opinions regarding dialing system's ATDS' "autodialer" status, as he had "never reviewed the LiveVox system used in this case" and "did not know what dialing system LiveVox uses." However, unlike the present case, *Marshall* involved a "point-and-click" dialing system, which requires a clicker agent's intervention to place phone calls. In excluding Mr. Snyder's testimony in Marshall, the court noted that even before ACA International, the "overwhelming weight of authority" found that point-and-click systems "do not constitute an ATDS as a matter of law in light of the clicker agent's human intervention." *Marshall,* 2018 WL 1567852. Thus, this case is not on point as it addresses a different type of system than the way the Zipwhip system works, given the ability of the Zipwhip system to send out numerous text messages at one time without "point and click" type human intervention. An ability, which Snyder clearly considered in reaching his opinions in this case, (LOM 5A and ML 250).

In *Legg v. Voice Media Grp., Inc.*, 2014 WL 1767097 at *3-4 (S.D. Fla. May 2, 2014), Snyder's testimony was excluded as "misleading and speculative," "lacking an adequate foundation," and grounded in "insufficient" facts. But, again, the present case is different as there is significant corroborating evidence in the record that the materials relied upon by Snyder represent how the systems actually operated, and provides significant credibility. See *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.*, 2018 WL 3707283, at *9 (N.D. Cal. Aug. 3, 2018) ("´[T]he fact that Mr. Snyder did not physically inspect the Ytel Dialer does not preclude Mr. Snyder's testimony about its nature" and distinguishing *Legg*). The other cases noted by Defendant misrepresent their holdings as well. *Ramos v. Hopele of Fort Lauderdale, LLC*, 334 F. Supp. 3d. 1262, 1265 (S.D. Fla. 2018) (court denied as moot the defendant's motion to exclude Snyder given

the granting of summary judgment); *Panzarella v. Navient Sols., LLC*, 2020 WL 3250508 at *3-5 (E.D. Pa. June 16, 2020) (no discussion of expert exclusion); *Glasser v. Hilton Grand Vacations Co.*, 2018 WL 4565751 at *7 (M.D. Fla. 2018) (same).

In counter, to the handful of cases noted by Defendant, Mr. Snyder has provided expert testimony in hundreds of cases where his expert opinion has been admitted and relied upon in assisting the fact-finder in making a decision in the case. *See,* Exhibit B, Snyder Expert Report and CV; *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc.,* 2018 U.S. Dist. LEXIS 132078, at *25-26 (N.D. Cal. 2018); *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 951 (9th Cir 2009); *McMillion, et al. v, Rash Curtis & Associates*, 2019 U.S. Dist. LEXIS 76332 (N.D. Cal 2019).

Defendant has failed to meet its burden in proving that Mr. Snyder's opinions should be excluded at trial. Even if Defendant lacks clarity on Snyder's opinions or questions the basis for them, this is not sufficient to exclude under *Daubert.* The issues and arguments made by Defendant are wholly aimed at the weight and credibility of Snyder's opinions, not their admissibility. "[A]t this early stage, robust gatekeeping of expert evidence is not required; rather, the court should ask only if expert evidence is useful in evaluating whether class certification requirements have been met." *Chinitz v. Intero Real Estate Servs*., 2020 U.S. Dist. LEXIS 247921, at *18 (N.D. Cal. July 22, 2020) (citing *Culley v. Lincare Inc*. 2016 U.S. Dist. LEXIS 105704 (E.D. Cal. Aug. 10, 2016). Defendant will have the opportunity to examine Snyder on his opinions at trial and it will be up to the jury to determine the appropriate weight to be given to his opinions in light of the issues which Defendant raises. As such, Plaintiff respectfully requests the Court to deny Defendant's motion to exclude Plaintiff's Expert, Randall Snyder.

B.  <u>VERKHOVSKAYA SHOULD NOT BE EXCLUDED AS AN EXPERT</u>

Plaintiffs hired Ms. Verkhovskaya to provide expert assistance in identifying and ascertaining potential class members for Plaintiff's proposed putative classes, the ATDS Class, the internal do-not-call ("IDNC") list Class, and the national do-not-call registry ("NDNCR") Class. Verkhovskaya's methodology and data are not unreliable or flawed and it was primarily due to the Defendants' tampering with evidence and failing to cooperate with discovery in good faith that additional reports were needed. There is no challenge to Ms. Verkhovskaya's qualifications and she provides a sufficient basis for class ascertainability, thus her opinions should not be excluded.

1. <u>**Verkhovskaya's Opinions Relating To The Internal Do Not Call List Should Not Be Excluded**</u>

Concerning the IDNC class, Verkhovskaya opined that the class contains well over forty members, and presented a methodology for ascertaining those members. LOM seeks to preclude Verkhovskaya's IDNC opinions for two reasons. First, because Verkhovskaya did not consider text messages received after a "stop" text was sent. Second, LOM believes that Zipwhip's stop text feature is sufficient to avoid contacting individuals who request not to be contacted. Neither of these arguments satisfy the *Daubert* standard of reliability as *Daubert* motions are not meant to litigate the legal issues of the claim, and experts cannot be excluded on the basis of liability determinations.

LOM's first challenge to the IDNC opinion comes from a basic misunderstanding of the elements of the IDNC claim. The elements of an IDNC claim are straightforward. 47 C.F.R. § 64.1200 states: "'[n]o person or entity shall **initiate any call** for telemarketing purposes to a residential telephone subscriber unless such person or entity has instituted procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of that person or entity,' prior to listing the minimum standards these procedures must meet." *Shelton v. Fast Advance Funding, LLC*, 378 F. Supp. 3d 356, 364 (E.D. Pa. 2019) (emphasis in

original). Nowhere within the statute is there an explicit requirement upon the consumer to respond with "stop" as a necessary element. *Id.* Therefore, the fact that "not a single Honda customer received a subsequent text message after typing 'stop'" is irrelevant to establishing the methodology for ascertaining the class. Any consumer that was sent any messages, regardless of subsequent cessation requests, has a claim for violation of the TCPA's internal do-not-call list requirements.

Given that Plaintiffs and the class's IDNC claims do not require the receipt of a text message after sending "stop" to Zipwhip, Verkhovskaya's methodology does not take this stop message into consideration. The purpose of Verkhovskaya's report was to establish a methodology for identifying class members that belong to the IDNC class. Because the basic elements of the IDNC claim only require the initiation of a text message from a business without an internal list, Verkhovskaya's report focuses on these elements.[2] *Krakauer v. Dish Network, L.L.C.*, 2015 U.S. Dist. LEXIS 118858, at *20 (M.D.N.C. Sep. 8, 2015) (challenges to factual underpinnings are not proper in a *Daubert* motion).

## 2.  Verkhovskaya's Opinions List a Clear Methodology for Class Identification

Within her reports, Verkhovskaya provided a list of steps that could be used to ascertain members of all three classes seeking certification: the ATDS class, IDNC class and DNC class. Verkhovkaya testified that the ATDS and IDNC class apply the same six identification steps. The DNC class requires a seventh step. There is no dispute that Verkhovskaya has issued several

---

[2] If the Court is inclined to address the merits of Plaintiffs' claims within this Daubert motion, the existence of sufficient procedures is clearly lacking. Even if LOM is allowed to rely on Zipwhip's technology, it must still meet the requirements of 47 C.F.R. § 64.1200(d)(1)-(6). LOM is unable to establish even a single one of these requirements. For example, under d(1), a written policy for maintaining a do-not-call list is required and is not something that LOM has and Zipwhip has confirmed it did not maintain any do-not-call list. See Exhibit S. Or under d(2), which requires informing and training employees regarding the existence and use of the do-not-call list, LOM has provided testimony that no such training was provided. Exhibit 3, Deposition of Salvador Iocono, 94:18-96:3; 97:10-98:3, 107:16-108:4 Accordingly, this argument holds no weight.

reports in this case. Verkhovskaya's reports required supplementation because Defendant withheld data (mistakenly or not) which needed to be addressed. The final report was supplemented to address the critiques of Defendant's expert witnesses, and correct a programming error.

"[T]he test of reliability is flexible" and may include specific factors mentioned in *Daubert I* and other decisions, but a district court has "broad latitude" in deciding the appropriate factors to consider in determining reliability. *Kumho*, 526 U.S. at 141-42. Some factors that the district court may consider are: general acceptance of the method in the scientific community; whether the method has been subject to publication or peer review; whether the known or potential error rate is acceptable; whether the testimony is based on independent research or prepared specifically for litigation; and whether the expert points to an objective source to show that she has followed the scientific method. *In re Countrywide Fin. Corp. Mortg.-Backed Sec. Litig. v. Countrywide Fin. Corp.*, 984 F. Supp. 2d 1021, 1026 (C.D. Cal. 2013); (internal citations omitted).

In cases not involving scientific testimony, "[t]he factor identified in *Daubert* may or may not be pertinent in assessing reliability, depending on the nature of the issue, the expert's particular expertise, and the subject of his testimony." *Betterbox Commc'ns Ltd. v. BB Techs., Inc.*, 300 F.3d 325, 329 (3d Cir. 2001) (*citing Kumho Tire Co., Ltd.*, 526 U.S. at 152). Instead, the "relevant reliability concerns may focus upon personal knowledge or experience." *Id*. In this case, which does not involve scientific testimony, Verkhovskaya's methodology is rooted in her personal knowledge and substantial experience as an expert where she has repeatedly shown that her methods identified potential members and these numbers can be reproduced by her methods, thus she is able to show both "how" and the "why" she reached her conclusions. *See Delgado v. Unruh*, 2017 U.S. Dist. LEXIS 35790, at *33 (D. Kan. 2017) (Thus, this Court concludes that Dr. Raasch's conclusions provide a formulaic, repeatable, sufficiently reliable method of analyzing the stress

placed on the body during the subject accident.); *R.C. Olmstead, Inc., v. CU Interface, LLC,* 606 F.3d 262, 271 (6th Cir. 2010) (citation omitted).

LOM argues that Verkhovskaya's report is inconsistent, unreliable, and confusing for many reasons. First, Verkhovskaya's supplemental reports resulted in different number of class members than earlier reports. Second, that Verkhovskaya failed to apply the methodology to the IDNC and ATDS class to determine any impact on those classes by the methodology laid out in the S&R report. Third, Verkhovskaya's methodology required "manual review" when her deposition testimony stated that no manual review was required to ascertain the class. Fourth, during deposition testimony, Verkhovskaya could not on the spot explain why 3 of 17,000+ text messages were excluded. Fifth, that the methodology excluded some of the named Plaintiff's from the final list of class members. Sixth and finally, Verkhovskaya's final report supplemented her earlier report leading to a new method for determining business records. Plaintiffs will address each of these baseless arguments in turn.

### i.   Supplemental Reports

LOM's first argument rests with a chart presentation concerning the differences between each of the reports issued by Verkhovskaya. Defendant correctly notes that the number of class members for each class changed with each supplemental report. This is so because LOM continued to provide Plaintiffs with new class data, which produced different results. This is also because Verkhovskaya made her methodology more conservative to rebut and address numerous criticisms presented by LOM's expert witnesses. The methodology and results identified in the final S&R Report is what Plaintiffs will be moving forward to class certification with. The very fact that there were supplemental reports with different results is not a basis for exclusion under *Daubert* nor are they relevant given that Verkhovskaya will not be providing testimony regarding the results of

earlier reports. Further, Defendant tries to argue that "no new information was provided" between the June 2021 report and the September S&R Report and relitigate the final report provided by Verkhovskaya. However, the Court has already dealt with this issue, and Defendant was able to obtain supplemental testimony from Verkhovskaya, at Plaintiff's cost, resolving any issues involving reliance on the S&R Report due to procedural issues. [ECF 137].  Thus, the very fact that there were supplemental reports with more conservative steps is not a basis for exclusion. At worst, this goes to the weight of the evidence, but in actuality the use of a more conservative approach, as noted by Defendant, makes Verkhovskaya's methodology all the *more* reliable.

      ii.      <u>Application of S&R Report Methodology to ATDS and IDNC Classes</u>

LOM argues that Verkhovskaya failed to apply the methodology outlined in the S&R Report to the ATDS and IDNC Classes and render an opinion on class size. Under Second Circuit law however, Plaintiffs are not obligated to provide the specific number of class members within their expert report in order to establish numerosity. *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Here, while the analysis for the DNC class required a 7-step process, Verkhovskaya testified that only the first 6 of the 7 steps were needed for the other classes. Defendant's Exhibit J, at 46-48. Because the 7-step process resulted in 422 class members, removing the more restrictive step 7 will result in more class members. Thus, Verkhovskaya could opine that the ATDS and IDNC class members are above 40 and the methodology is laid out, on how to ascertain these classes.

      iii.     <u>Verkhovskaya's Did Not Manufacture Results Through "Manual Review"</u>

Next, LOM argues that Verkhovskaya's methodology for successfully removing business numbers was only completed through "manual review" to "manufacture the results." LOM bases this argument based on coding sequence within Verkhovskaya's computer code that identifies some manual work to have occurred. Verkhovskaya's methodology for removing non class

members was clearly laid out in her report, and discussed during her deposition. The "manual review" referred to a manual step of removing from excel rows that had firstseen/lastseen LexisNexis dates outside of the dates of texts to those calls. Exhibit 4, Declaration of Anya Verkhovskaya. Removing these consumers from the class list is consistent with the steps Verkhovskaya identified and the methodology for removing business numbers. *See* Defendant's Exhibit H, Thus, Verkhovskaya's report does list a clear methodology for identifying and ascertaining the class, step by step, and engaging in one step manually, does make the method unreliable; to the contrary, it produced the very results Defendant argued for.

iv.    <u>0169's Exclusion from the Class List</u>

During Verkhovskaya's deposition, LOM decided to isolate the 0169 number, without prior notice, and ask Verkhovskaya to explain why this single number was not included in the final class list she provided. LOM argues that because Verkhovskaya could not provide this precise answer on the spot during her deposition, her methodology is not reliable. Having time to see why 0169 was precluded from the final list however, Verkhovskaya is now able to explain that this was excluded because the "first seen date" of the LexisNexis 'Residential' flag occurred after last text the telephone number received on 10/31/17. *See* Exhibit 5, Verkhovskaya Declaration. As such, this was appropriately removed under the 7 step process. Given the fact LOM was only able to cherry pick one number out of 17,000+ consumers, as being inaccurately classified, indicated that Plaintiff's methodology is in fact clearly reliable and the evidence speaks for itself.[3] *Krakauer v. Dish Network, L.L.C.*, 2015 U.S. Dist. LEXIS 118858, at *25 (M.D.N.C. Sep. 8, 2015) (To the

---

[3] During deposition testimony, LOM asked Verkhovskaya about two other numbers that she could not explain right then and there. See Exhibit 5, Verkhovskaya Declaration for explanation of why these numbers were excluded as well within the methodology.

extent Ms. Verkhovskaya missed a few business numbers out of more than 28,000,that is insufficient to establish that she has not reliably applied her methodology to the data).

     v.     <u>Named Plaintiff Exclusion</u>

LOM also seeks to question the reliability of Verkhovskaya's methods by asserting that her methodology for identifying the DNC class necessarily excludes Plaintiffs Greene, Watson Samarghitan, and Jackson. However, Plaintiff fully admits that this is correct and these Plaintiffs are excluded from the DNC, which in fact confirms Verkhovskaya's reliability on this issue. As seen in Plaintiffs' Motion for Class Certification, these Plaintiffs only seek to represent the ATDS and INDC class. Plaintiff Espinal will be representing the DNC class. Further, while Greene was previously a member of the DNC class list, this was before LOM turned over all of Greene's text messages resulting in her exclusion from this list under Step 3. Thus, these facts and arguments are also insufficient to demonstrate a lack of reliability necessary to preclude under *Daubert*.

     vi.     <u>Business Record Methodology</u>

With this argument, LOM highlights that prior to the S&R Report, LOM's expert criticized Verkhovskaya's methodology for ensuring numbers texted as residential. In the rebuttal however, Verkhovskaya lays out numerous steps for verifying numbers as residential. To exclude business numbers, Verkhovskaya first removed business numbers that appeared in either the Lexus Text Records or Honda Contact File. Exhibit H, ¶35. Next, Verkhovskaya removed numbers associated as business by using the LexisNexis business historical reverse append. *Id*. Third, Verkhovskaya removed all numbers associated with a business within the data file "Service Report." *Id*. Finally, Verkhovskaya removed all business telephone numbers based on standard business identification keywords. *Id*. After engaging in these five steps to preclude business numbers, Defendant, through its expert Smith, remained with a sole rebuttal to Verkhovskaya's S&R Report that relying on

LexisNexis was not a reliable methodology. This will be addressed below. However, it is notable that all of the business numbers that Smith attempted to highlight as remaining within the class list, were already excluded within the other steps provided by Verkhovskaya, demonstrating the methodologies reliability.

### 3. Verkhovskaya's Use of LexisNexis Within Her Methodology for Determining Residential Telephone Numbers is Reliable and Court Approved

In reaching her conclusions concerning which class members were residential, Verkhovskaya relied upon data from LexisNexis. LOM argues that the data from LexisNexis is not reliable and therefore, Verkhovskaya's opinions are not reliable. To reach this conclusion, LOM relies on a declaration submitted in *Chinitz v. Intero Real Estate Services*, Case No. 5:18-cv-05623-BLF (N.D. Cal 2020), where Craig Davis, an employee of LexisNexis declared that "LexisNexis does not have data classifying all telephone numbers as business, residence or government." Puzzlingly, LOM failed to see whether the *Chinitz* court itself bought this argument against Verkhovskaya's opinions in that matter. To the contrary, the Court rejected it.

In *Chinitz*, 2020 U.S. Dist. LEXIS 247921, at *15 (N.D. Cal. July 22, 2020), the court addressed two issues with relying on LexisNexis data to weed out business numbers. First, that the text messages were not confirmed as sent inside the relevant date range, as found within the LexisNexis query. Second, that LexisNexis report only flagged six numbers as "residential" numbers, while the other numbers were not definitively residential. *Id*. at *19.[4] Despite these criticisms, the court found use of LexisNexis to weed out business numbers to be a reliable methodology, as this type of data "is reasonably relied upon by experts in the field." *Id*. at *20.

---

[4] In other words, the same methodology concerning the "MLR" or "most likely residential" was found sufficiently reliable, and the defendants objections went to the weight of the evidence, not their admissibility. "Ms. Verkhovskaya started with the assumption that the numbers were residential because they were registered with the NDNCR, but used LexisNexis to remove any business numbers that may have been registered with the NDNCR." *Id*. at *19.

The same holding was reached by numerous courts. *See Williams v. PillPack LLC*, 2021 U.S. Dist. LEXIS 27496, at \*19 (W.D. Wash. 2021); *Abante Rooter & Plumbing, Inc. v. Alarm.com Inc*., 2017 U.S. Dist. LEXIS 69307 (N.D. Cal., 2017), *amended* 2018 U.S. Dist. LEXIS 13271, 2018 WL 558844 (N.D. Cal. 2018); *Krakauer v. Dish Network, L.L.C.*, 2015 U.S. Dist. LEXIS 118858, 2015 WL 5227693, at \*11 (M.D.N.C. Sept. 8, 2015); *Cordoba v. DIRECTV, LLC*, 320 F.R.D. 582, 599 (N.D. Ga. 2017).

Given that numerous courts have found the use of LexisNexis data to be reliable in the industry, LOM cannot move to exclude Verkhovskaya's opinion as unreliable. *Daubert* motions are not meant to act as a vehicle to have the Court disagree with expert opinion. *Daubert* is only to address whether the witness has presented a reliable methodology. Here, Verkhovskaya has satisfied this burden. The arguments presented by LOM at best go the weight of the opinion, not admissibility. *Chinitz*, 2020 U.S. Dist. LEXIS 247921, at \*15 (N.D. Cal. July 22, 2020). The methodology set forth by Verkhovskaya comports with standards in her industry, and relies on methods which are court approved. *See* Exhibit 4. Verkhovskaya specifically limited the LexisNexis date range to comport with the timeframe that LOM sent text messages, and applied the same MLR methodology approved in *Chinitz*. *See* Exhibit G, ¶19; Exhibit H. pg 7-9. Even further, LOM itself admits that applying Verkhovskaya's methodology, results in 44 class members that are indisputably residential phone numbers. Therefore, there can be no question that Verkhovskaya cannot be stricken as an expert in this case where the method stands up to all of Defendant's scrutiny.

### 4.   The "Reverse Lookup" To Identify Cell Phone Users is Irrelevant

As a last resort to exclude Verkhovskaya, LOM next seeks to strike her on the basis that numerous courts have found the "reverse lookup" process unreliable to identify the names and

addresses of class members who were users or subscribers of cell phone numbers. In this case, Verkhovskaya has not utilized the "reverse lookup" process which LOM seeks to strike. To the contrary, Verkhovskaya testified that "reverse lookup" *could* be utilized in the event the customers lists were insufficient. Here however, the customer lists clearly list each class member so there is no need to rely on this back up process as a means to identify names and addresses of class members.

To avoid confusion, it is necessary to explain which "reverse lookup" process LOM is referring to within its motion. Within Verkhovskaya's October 2020 report, Verkhovskaya stated that the identities of most, but not all, of the class members were available through the Honda Contact File. Defendant's Exhibit D, October 2020 Expert Report, ¶ 39. Verkhovskaya went on to explain that for the remaining class members that are not contained within the Contact File, she *could* apply a historical reverse append process to identify the remaining class members. In the October report, Verkhovskaya went into great detail concerning how the reverse append process works, and the methodology she would employ if necessary. Essentially, this process will be able to look at the names and addresses of subscribers during a specific time frame. *Id.,* ¶ 42.

Since the creation of the October 2020 report, Plaintiffs have obtained additional information from Defendant and its third-party data storage company, CDK. The information received contains the complete identity for all class members. Accordingly, while ML 483 identifies all of the telephone numbers that text messages were sent to, Plaintiffs are able to identify which class members the number belongs to by matching these numbers to the Honda Contact File, the Honda Sale List, and the Honda Service List. Within these files, the name and address for each class member can be found and matched. Exhibit 5, 102:23-103:9; Defendant's Exhibit H, ¶

58. Accordingly, there will be no need for Verkhovskaya to rely on any historical reverse append process. *See* Exhibit 4; Exhibit 5, 194:4-22.

Verkhovskaya has made it clear to Defendant that the reverse append would only be a possible option if necessary. During her deposition, Verkhovskaya made it clear that the only reason the reverse append process would be necessary was if the sales list and service list did not have the necessary information. Exhibit 5, 194:4-22. Within the September 2021 S&R Report, Verkhovskaya made it even more clear that the documents received during discovery were sufficient to identify the class without the need to resort to reverse append. Verkhovskaya specifically opined that "there is a reliable method of identifying class members and issuing a notice of class certification to them **based on the names and addresses that Defendants have and have made available to me**." Defendant's Exhibit H, ¶ 58. Accordingly, the reverse append issue is moot.

## IV.   <u>CONCLUSION</u>

For all of the foregoing reasons, Plaintiff respectfully requests the Court to deny Defendant's Motion to Exclude Plaintiff's Experts Snyder and Verkhovskya.

Dated: March 16, 2022                                  Respectfully Submitted,

                                                                      <u>/S/ Daniel Zemel, Esq.</u>
                                                                      Daniel Zemel, Esq.
                                                                      Elizabeth Apostola, Esq.
                                                                      **Zemel Law LLC**
                                                                      660 Broadway
                                                                      Paterson, New Jersey 07514
                                                                      (P) (862) 227-3106
                                                                      dz@zemellawllc.com
                                                                      ea@zemellawllc.com
                                                                      Attorneys for Plaintiff and the
                                                                      Proposed Class

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of March 2022 a true and correct copy of the foregoing

document was sent to all counsel of record via the Court's ECF system.


/s/ Daniel Zemel
Daniel Zemel, Esq.

26